421 A.2d 1027

**Theodore KACZKOWSKI, Administrator of the Estate of Eric K. Kaczkowski, Deceased, on behalf of the Estate of Eric K. Kaczkowski, Deceased, Appellant,**

v.

**John J. BOLUBASZ, Appellee.**

Supreme Court of Pennsylvania.

Argued March 10, 1980.
Decided Sept. 22, 1980.

562

Seymour Sikov, Sikov & Love, Pittsburgh, for appellant.

Cosmos J. Reale, Warren D. Ferry, Pittsburgh, for appellee.

Stephen M. Feldman, Feldman & Feldman, Philadelphia, for amicus curiae Pa. Trial Lawyers.

EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

NIX, Justice.

Appellant instituted a complaint in trespass in Allegheny County Court of Common Pleas. The suit arose from an

automobile accident in which the decedent, Eric K. Kaczkowski, was riding as a passenger in a vehicle operated by appellee. At the original trial of this matter, the jury established the liability of the appellee. Upon appellant's Motion For a New Trial, the case was returned to the trial court for a retrial on the issue of damages.

During the retrial of the question of damages, the jury was presented with the following facts: the decedent was a white male, twenty years of age at the time of his death; he attended Alliance College, Cambridge Springs, Pennsylvania for two years; and at the time of his death, he was attending the Institute of Computer Management, a division of Litton Industries. Decedent's close friends and relatives testified that decedent was in good health, industrious, and interested in his course of study in computer operations.

The Director of Placement at the Institute for Computer Management testified to his familiarity with the decedent, that his progress was good for a beginning student, and that the decedent evidenced motivation and willingness to learn. Based upon his professional contact with employers and experience in placing graduates, the Placement Director testified to the range of salaries for which the decedent would have been qualified. He stated that in the private sector, the average salaries ranged from $538.36 to $585.77 per month, and in the public sector, the average salaries ranged from $600 to $900 per month.

During an in-chambers discussion, appellant's counsel offered to call as an expert witness, Doctor Reuben E. Slesinger, an Economics Professor at the University of Pittsburgh. By the testimony of Doctor Slesinger, counsel offered to prove a projection of the potential earning capacity of the decedent.[1] Although the trial court did not prohibit Dr.

1. The projection took into consideration factors which had previously been testified to by various witnesses called on behalf of appellant. Counsel for appellant advised the Court that Dr. Slesinger would have testified as to the effects of productivity increases and inflation on the potential earning capacity of the decedent. The proffered projection did not take into consideration pensions, social security

Slesinger from testifying as to his projection of future lost earnings reduced to present value, the court refused to allow Dr. Slesinger to use a four percent (4%) annual increment to the victim's base salary to represent the combined impact of inflation and productivity gains on the future increases in the victim's earnings. The trial court's refusal was based upon the recently decided case of *Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976),[2] which the trial court interpreted to mandate that "an annual increment percentage whether called a productivity factor or inflation factor is not permitted to be used by a witness projecting future loss of earnings reduced to present worth." *Kaczkowski v. Bolubasz*, No. 1246 April Term, 1978, Court of Common Pleas of Allegheny County, at 3 (February 22, 1978).

Rather than have Dr. Slesinger project the future loss of earnings without the four percent (4%) annual increment, the plaintiff chose not to use any of Dr. Slesinger's testimony. Instead, the plaintiff relied upon the trial court's charge of impairment of future earning power for the guidance of the jury. The lower court charged the jury to consider the decedent's personal characteristics to: calculate the potential gross earnings of the decedent for the period of decedent's work life expectancy; to determine the maintenance costs of the decedent for the period of decedent's work life expectancy; to deduct the personal maintenance costs from the gross earnings to produce net earnings; and to discount the net earnings to present value by six percent (6%) simple interest. Based upon the judge's instructions, the jury returned a verdict of $30,000. on behalf of the estate of Eric K. Kaczowski. The appellant's Motion for a New Trial was denied. The appellant appealed to the Superior Court which per curiam affirmed the lower court based upon the Superior Court's prior decision in *Havens v. Tonner*. *Kaczkowski v. Bolubasz*, No. 755 April Term, 1978 (Superior Court of Pa.,

benefits, fringe benefits, or the like, and this appeal is not concerned with these items.

**2.** See discussion of *Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976), beginning at page 1031, *infra*.

May 4, 1979). Appellant filed a Petition for Allowance of Appeal with this Court and we granted allocatur.[3]

The issue raised by appellant is whether the trial court erred in excluding reliable economic testimony showing the impact of inflation[4] and increased productivity[5] on decedent's future earning power.[6] In order to address this issue, we must consider current Pennsylvania law and reassess its effectiveness in light of the purported objective of awarding full compensatory damages for loss of future earnings. To the victims of negligence or their survivors, the law of damages is of at least the same concern as the substantive law of torts. We have been quick to change substantive tort law where it has been determined that the needs of a changing society so dictated. *See e. g., Sinn v. Burd,* 486 Pa.

3. Jurisdiction over this appeal is pursuant to 42 Pa.C.S.A. § 724.

4. Inflation is "the increase in the volume of money and credit relative to available goods resulting in a substantial and continuing rise in the general price level." Websters, Third International Dictionary (1965). Inflation gains are measured in terms of what the average person refers to as "cost of living increases." An example of inflation evidencing an increase in prices unrelated to an increase in intrinsic value is that the juice content of oranges has not increased in years, but their price continues to rise.

   The presence of inflation plays two distinct roles in an award for prospective damages. The first role is determining the impact of inflation on the future earnings of the victim. The second place in which inflation plays a part is in determining the appropriate interest rate to discount the future damage award to its present value.

5. Economist's recognize that there are at least four major elements which influence the rate of increase of an employee's income. These factors are: (1) the educational attainment of the participant prior to his entry into the labor marker; (2) the influence of age upon the earnings of participants over their life cycle; (3) the significance of productivity and growth; and (4) the impact of inflation. Henderson, *The Consideration of Increased Productivity and Discounting of Future Earnings to Present Value,* 20 S.D.L.Rev. 307 (1976). In our analysis, we will isolate the inflation element from the other three factors, collectively called "merit" increases, which are consumed in productivity. We recognize that merit increases are controlled by different variables than the inflationary factor, and deserve separate consideration.

6. Since damages in personal injury and wrongful death actions involve the lost earning capacity of the victim, the proper period to calculate a loss is based upon work–life expectancy.

146, 404 A.2d 672 (1979); *Azzarello v. Black Bros. Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Mayle v. Pa. Dept. of Hwy.*, 479 Pa. 384, 388 A.2d 709 (1978); *Fadgen v. Lenker*, 469 Pa. 272, 365 A.2d 147 (1976); *Ayala v. Phila. Bd. of Education*, 453 Pa. 584, 305 A.2d 877 (1973). We are now called upon to determine whether the law of damages is in need of similar adjustments due to changes of circumstances occasioned by the passage of time and conclude that both a productivity factor and inflation should be reflected in an award of lost future earnings.

## I. Current Law

■ In this Commonwealth, we have consistently held that damages are to be compensatory to the full extent of the injury sustained. *Incollingo v. Ewing*, 444 Pa. 299, 307, 282 A.2d 206, 210 (1971); *McLane v. Pittsburgh Rys. Co.*, 230 Pa. 29, 79 A. 237 (1911); *Montgomery Bank v. Reese*, 26 Pa. 143, 146 (1850). The rule "is to give actual compensation, by graduating the amount of damages exactly to the extent of the loss." *Forsyth v. Palmer*, 14 Pa. 96, 97 (1850). Loss of future earnings is a distinct item of damages, which if properly proved, may result in recovery for the plaintiff.[7]

■ Inflation and productivity increasingly demand judicial attention, particularly with respect to personal injury action damages for lost future earnings. Traditionally, evidence of future inflation and productivity increases have been deemed too speculative to be included in calculating future damages even though inflation and productivity increases may drastically reduce an initially generous award. *18 Washburn L.J.* 499 (1979). However, today, in light of clear scientific evidence of the fact that inflation and productivity have become an established part of our economy, it

---

7. When an injury is a permanent one, one which will cause a loss or lessening of future earning power, a recovery may be had for the probable loss of future earnings. McCormick, *Damages*, 299 (20th reprint 1975). If the injured party survives, he should receive undiminished, his total estimated future earnings, but if he dies, the proper measure of damages includes a deduction based upon decedent's cost of personal maintenance. *Incollingo v. Ewing*, 444 Pa. 263, 307, 282 A.2d 206, 228 (1971). Today's opinion does not disturb our requirement for personal maintenance deductions.

becomes necessary that these factors be considered in such awards.

■ The "law does not require that proof in support of claims for damages or in support of compensation must conform to the standard of mathematical exactness." *Lach v. Fleth*, 361 Pa. 340, 352, 64 A.2d 821, 827 (1949). All that the law requires is that "(a) claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough." *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 453–54, 197 A.2d 721, 727 (1964). *See* also, *Small v. Flock*, 407 Pa. 148, 180 A.2d 59 (1962); *Getz v. Freed*, 377 Pa. 480, 105 A.2d 102 (1954). "If the facts afford a reasonably fair basis for calculating how much plaintiff's entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Western Show Co., Inc. v. Mix*, 308 Pa. 215, 162 A. 667 (1932).

■ Personal injury awards are usually lump–sum payments, and are not paid in weekly or monthly installments.[8] Thus, all damages for personal injuries, including damages expected to accrue in the future,[9] must be proved and calculated at trial. D. Dobbs, *Remedies*, § 8.1 (1973). The loss of future wages is discounted to its present value by using the six percent (6%) simple interest figure.[10]

8. The Workmen's Compensation Act is the most notable exception, Act of February 28, 1956, P.L. 1120 § 1 et seq., (1955) *as amended*, 77 P.S. § 1 *et seq. See* also No–Fault Motor Vehicle Insurance Act, Act of July 19, 1974, P.L. No. 176, § 106(a)(7), 40 P.S. § 1009.106(a)(1).

9. In order for the factfinder to assess the precise measure of damages, expert testimony is admissiblie if "the subject matter of the inquiry is one involving special skills and training beyond the ken of ordinary laymen." *Reardon v. Meehan*, 424 Pa. 460, 465, 227 A.2d 667, 670 (1967).

10. The rationale for reducing a lump–sum award to its present value is that:

it is assumed that the plaintiff will invest the sum awarded and receive interest thereon. That interest accumulated over the number of relevant years will be available, in addition to the capital, to provide the plaintiff with his future support until the total is exhausted at the end of the period. The projected interest must

Specifically, the principles relating to the limitation of the proof and consideration of the economic factors affecting lost future earnings have been articulated recently in *Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976). In *Havens*, the appellant and the appellee were involved in an automobile accident. The appellee suffered whiplash, as well as a weakness in his right arm and leg. After his employer's reorganization of the corporate sales office, ap-

therefore be allowed in reduction of capital lest it be claimed that the plaintiff is overcompensated.

Fleming, *Inflation and Tort Compensation*, 26 Am.J.Comp.Law 51, 66 (1977).

"The measure of the lump–sum award for future pecuniary losses arising from a tort is the present worth of the full amount of what would have been received at a later time." *Restatement of Torts* (Second) § 913A, *Wilkinson v. Northeast Borough*, 215 Pa. 486, 74 A. 734 (1906). In Pennsylvania, since 1922 our courts have mandated that when discounting future damages to present worth "the interest must be computed at the lawful rate of six percent. . . ." *Windle v. Davis*, 275 Pa. 23, 118 A. 503 (1922). The rationale for the mandatory six percent simple interest rule was explained by this Court in *Gregorius v. Safeway Steel Scaffolds Co.*, 409 Pa. 578, 585, 187 A.2d 646, 649 (1963):

"We are all aware that present interest rates are different than as of the year this [fixed six per cent] rule was first written. In fact, they presently vary from day to day, place to place, and under different conditions in the same area. There must be a fixed rule to aid juries in calculating the present worth of such elements of damage and to guide the jury in resolving such difficult questions. It is our conclusion that a change in the rule would lead only to confusion and chaos and add greater difficulty in the trial of such cases."

The origin of this principle is *Chesapeake & Ohio RW Co. v. Kelly*, 241 U.S. 485 [36 S.Ct. 630, 60 L.Ed. 1117] (1916), in which the Supreme Court announced that awards for future damages had to be discounted to present value at some appropriate discount rate. Research reveals that the discounting theory is grounded in economic history of the latter part of the nineteenth century. "Between 1867 and 1896, for example, it is estimated that the price level dropped by about forty percent. At the turn of the century, one needed only approximately sixty percent of the dollars required at the end of the Civil War to purchase the same basket of goods." 20 S.D.L.Rev. at 309. When future prices are expected to decline or remain constant, there is no economic disagreement with the discounting theory. However, an economic lag of judicial practice occurs when courts perpetuate a 1916 rationale to the economic realities of the 1900's. *Id.*

pellee's employment was terminated. As of his termination date, appellee claimed a total and permanent disability.

In the common pleas court, the jury returned a verdict in favor of the appellee. On appeal to the Superior Court, the appellant objected to the admissibility of an economist's testimony on appellee's lost future earnings. During trial, the economist calculated lost future earnings based upon a projected work life of 20.69 years. He assumed that if appellee continued as an employee he would have earned $12,780. annually, plus fringe benefits. A 3½ percent productivity factor was added to this figure.

The economist explained his calculation of the productivity factor as follows:

What I have taken into account here is the fact of productivity increases in the future, to try and allow for future increases in wages which would come about due to the fact that the economy over a long period of time has had a tendency to exhibit an increase in the propensity to produce goods and services at a faster more efficient rate. Namely, due to better technology. This, over the longrun [sic] is the principal cause or the principal reason why a person's wages rise; if he can produce twice as much in an hour after learning to do his job better, his employer can afford to pay him more because the employer has more goods that this individual produced that he can now offer for sale and, in fact, in the longrun [sic] in the American economy, productivity has increased or the ability of American workers to produce more goods and services in an hour somewhere around three and a half per cent, therefore, I have allowed the wage increase here approximately of about three and a half percent perannum [sic] for the remaining period of his work–life expectancy. 243 Pa.Super. at 385, 365 A.2d at 277–78.

The Superior Court refused to accept the economist's testimony concerning a 3½% productivity factor. It reasoned that the productivity factor "was based upon nothing but the economist's assertion that experience demonstrated that industrial productivity increased annually by at least

that much due to improved technology and that this improvement was normally passed along in the form of increased wages." *Id.*, 243 Pa.Super. at 378, 365 A.2d at 1274. The Superior Court rationalized its holding as follows:

Steadily rising wage rates over the next twenty years, whatever the cause, are simply one face of the coin of inflation. It may be that inflation will become so much an established pattern of our economy that it should be recognized in estimating loss of future earnings. Certainly the erratic behavior of the economy over the past half dozen years, plagued by war and other unusual circumstances, is not a sufficient demonstration that inflation at any predictable rate will continue for another twenty years. Furthermore, even if inflation is a part of the pattern of the future, one certain consequence is that interest rates on money will reflect that fact. Consequently, a sum representing the present worth of future earnings will earn more in dollars in an inflationary period than would otherwise be the case. This may not wholly compensate for the effect of inflation over the next twenty years. We view the "productivity factor" as simply a substitute for inflation and equally speculative and inadmissible in a calculation of future earnings.

*Id.*

Thus, it appears that the *Haven's* Court misunderstood that inflation and productivity were separate and distinct phenomena and the court failed to distinguish between the two in its blanket rejection of the productivity factor that was offered in evidence. Therefore, under the teaching of *Havens*, a tort victim in Pennsylvania who institutes an action to recover lost future earnings only receives compensation based upon his or her salary as of the date of the debilitating event. The current earning amount is multiplied by the number of years remaining in the victim's worklife span. The total figure is then reduced to its alleged present value. There is no allowance made in the lost future earning formula for consideration of either potential productivity or inflation.

## II.  Fallacy of Havens

Ideally, a damage award computation should achieve the tripartite goals of accuracy, efficiency, and predictability. *Freeport Sulphur Co. v. S. S. Hermosa*, 526 F.2d 300, 308–12 (5th Cir. 1976).  Commentators note that the Pennsylvania method of calculating lost future earnings achieves the efficiency goal by precluding expert testimony on inflation and productivity while confining the relevant inquiry to determining wages at the date of the debilitating event. Comment, *Inflation and Damages*, 63 Va.L.Rev. 105, 108 (1977); Note, *Considering Inflation in Calculating Lost Future Earnings*, 18 Wash.L.J. 499, 500 (1979), Fleming, *Inflation and Tort Compensation*, 26 Am.J.C.L. 51, 65 (1977). Since the inflation and productivity variables are removed from consideration in calculating the damage award, the award is more predictable and the possibility of settlement out of court is enhanced.  However, even assuming the premise that simplification is synonymous with efficiency and predictability, the Pennsylvania method sacrifices accuracy to the prejudice of the victim by failing to compensate the victim to the full extent of the injury sustained.  By an obstinate refusal to give any recognition to inflation and productivity, we ignore our responsibility to attempt to "graduate the amount of the damage award exactly to the extent of the loss." *Forsyth v. Palmer*, 2 Harris 96, 97 (1850).

We are aware that "[T]he orderly development of the law must be responsive to new conditions and to the persuasion of superior reasoning." *Griffith v. United Air Lines*, 416 Pa. 1, 23, 203 A.2d 796, 806 (1964).

[W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . . There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the

product of institutions or conditions which have gained a new significance or development with the progress of the years."

Cardozo, *The Nature of the Judicial Process*, 150–51 (1921).

Despite the uninformed belief of the *Haven's* court, inflation and productivity factors are not speculative and are capable of definition and prediction by economic experts. For decades, economists have been refining tools to forecast economic growth and have used these tools with proven accuracy. Sophisticated economic forecasts are relied upon by every major government agency, corporation, and financial institution. These forecasts are based upon all that is known in the American economy and despite small tolerances of error, these projections have been accurate in the past. *See, District of Columbia v. Barriteau*, D.C.App., 399 A.2d 563, 566 (1979). Thus, there exists a reasonable basis in fact for this court to consider the impact of inflation and productivity on lost future earnings. A court has a responsibility to the citizenry to keep abreast of changes in our society. In light of the recognized acceptance of the science of economics, the courts of this Commonwealth can no longer maintain their ostrich–like stance and deny the admissibility and relevancy of reliable economic data concerning the impact of productivity and inflation on lost future earnings. Indeed, to ignore economic realities and presume that there will be no changes in an individual's future earnings because of such factors is further removed from reality than any variance that may result from our efforts to predict these factors.

### a. Inflation

It would be ludicrous for this Court to cling to the *Haven* Court's conclusion that the presence of inflation in our economy is a temporary and passing phenomenon, influenced by "war and other unusual circumstances."[11] Information

11. From 1940 to 1972, the consumer price index, the government's measure of inflation, rose 185 percent. In terms of purchasing

gathered by the United States Bureau of Labor Statistics demonstrates that the American economy has been experiencing a steady increase in the cost of living over its history. Even though the rate of inflation has not been numerically the same for the past 40 years, the presence of inflation as a factor in our economy has been constant.[12] *Purchasing Power of the Dollar*: 1940–78, U.S. Bureau of the Census, Statistical Abstract of the United States: 1978 (99th Edit.).[13] Thus, while the rate of inflation may vary during any given period, its long term presence as a fact of life in our economic picture is certain.

## b. Productivity

Moreover, the assertion that productivity factors are too speculative to consider in computing lost future earnings is also fallacious.[14] An individual's future earning capacity is

power, it took almost $3.00 in 1972 to purchase what $1.00 would have purchased in 1940. The compounded rate of advances over this period is approximately 3.5% annually. *Purchasing Power of the Dollar*: 1940–78, U.S. Bureau of the Census, Statistical Abstract of the United States: 1978 (99th Edit.) Washington, D.C.

12. Since 1972, the Consumer Price Index (CPI) has not declined in any month. From 1967 through 1978 the CPI has risen 102%.

| | |
|---|---|
| 1972 – 3.4% | 1976 – 4.8% |
| 1973 – 8.8% | 1977 – 6.8% |
| 1974 – 12.2% | 1978 – 9.0% |
| 1975 – 7.0% | 1979 – 13.3% |

Bureau of Labor Statistics, U.S. Dept. of Labor, CPI Detailed Report 1 (Dec. 1972–1979). From June 1979 through June 1980 the CPI increased 14.3%.

13. Judge Friendly noted in *McWeeney v. New York, New Haven and Hartford Railroad Co.*, 282 F.2d 34, 38 (2d Cir. 1960):

"There are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have acumen to find investments that are proof against both inflation and depression–a task formidable for the most expert investor." (Footnote omitted.)

14. From 1947 to 1973 there was a 5.6% compound rate of increase in the average compensation of all persons in the private non–farm sector, or an overall increase of approximately 4½ times. United States Dept. of Labor, Bureau of Labor Statistics, Handbook of Labor Statistics 175 (1973).

capable of estimation based upon objective factors of age, maturity, education and skill.[15] Henderson, *Consideration of Increased Productivity and Discounting of Future Earnings to Present Value,* 20 S.D.L.Rev. 307, 312 (1976). A determination of an individual's future earning capacity based on objective criteria is far less speculative than most other estimates made by the trier of fact. *See e. g., Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978) (what might have happened to the decedent had he received proper medical care); *Wallace v. Pa. R.R.,* 222 Pa. 556, 561, 71 A. 1086 (1909) (future pain and suffering is recoverable if it is likely or probable to ensue); *Yost v. West Penn Railways Co.,* 336 Pa. 407, 410, 9 A.2d 368 (1939) (future medical expense can be recovered if they can be estimated).[16] Admittedly, predicting lost future earnings entails some degree of speculation. However, that alone does not justify excluding reliable economic evidence since imprecision is inherent in any computation of lost future benefits. In view of our acceptance of the reliability of the science of economics, the victim's lost future earning capacity should be treated like any other question of fact[17] and should be submitted to the trier of fact after a proper foundation and expert testimony.

**15.** Normally, in the beginning years of participation in the labor force, the aging process or the acquiring of knowledge is the most significant influence upon earnings. During the middle years, ages 35–44, productivity and growth dominate. In the last decade of one's work–life, inflation is largely responsible for most advances. Henderson, *Income Over the Life Cycle, Some Problems of Estimation and Measurement,* 25 Fed.Ins.Coun.Q. 15, 28–29 (1974).

**16.** "[R]egardless of the pattern of the increase in income over the life–cycle, the probability that one's money income will *not* rise, on an annual basis, approaches zero. There is little or no reason for disputing the fact that money earnings rise, the only problem is by how much, or at what rate, an issue which largely depends upon the segment of the labor market being investigated." 20 S.D.L.Rev. at 312.

**17.** In this Commonwealth, we allow the use of tables of present worth calculations prepared by qualified experts in order to provide a precise analytical calculation which will enhance the possibility of correct and just results. We also accept the reliability of mortality tables to calculate the victim's life expectancy. *Brodie v. Philadelphia Transport Co.,* 415 Pa. 296, 203 A.2d 657 (1959).

This Commonwealth now joins the growing number of jurisdictions which consider inflation and productivity as integral factors to be included in computing lost future earnings. *See Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967); *Richmond Gas Corporation v. Reeves,* 302 N.E.2d 795 (Ind.App.1973); *Resner v. Northern Pacific Railway,* 161 Mont. 177, 505 P.2d 86 (1973); *Plourd v. Southern Pacific Transportation Co.,* 266 Or. 666, 513 P.2d 1140 (1973); *Willmore v. Hertz Corp.,* 437 F.2d 357, 359–60 (6th Cir. 1974); *Schnebly v. Baker,* 217 N.W.2d 708 (Iowa 1974). *See also Bach v. Penn Central Transportation Co.,* 502 F.2d 1117 (6th Cir. 1974); *Weakley v. Fishbach & Moore, Inc.,* 515 F.2d 1260 (5th Cir. 1975) (interpreting Texas law); *United States v. English,* 521 F.2d 63 (9th Cir. 1975); *Tenore v. Nu Car Carriers, Inc.,* 67 N.J. 466, 341 A.2d 613 (1975); *Seaboard Coast Line R.R. Company v. Garrison,* Fla.App., 336 So.2d 423 (1976); *Markham v. Cross Transportation, Inc.,* 376 A.2d 1359, 1364 (R.I.1977); *Ossenfort v. Associated Milk Producers, Inc.,* 254 N.W.2d 672, 683–84 (Minn.1977); *Lumber Terminals, Inc. v. Nowakowski,* 36 Md.App. 82, 373 A.2d 282, 290–91 (1977).

### III.  Formulas Suggested By Other Jurisdictions

There are three significant approaches, traditional, middle ground, and evidentiary which the judiciary has adopted in considering the impact of future inflation and productivity on lost future earning capacity.  63 Va.L.Rev. at 128 n.155. The traditional approach ignores altogether the effects of future productivity and future inflation as being "too speculative."  This view was previously adhered to by this Commonwealth, but for reasons stated above, it is hereby rejected.

The middle ground approach is anomalous in that it permits the factfinder to consider the effects of productivity and inflation on lost future earning capacity, but prohibits expert testimony on either of these issues.  The proponents of this approach argue that expert testimony on future economic trends is "speculative," yet acknowledge that such facts are within the "common experience" of all jurors and,

therefore, jurors should not be prohibited from applying their common knowledge in reaching a verdict. *Bach v. Penn Central Transportation Co.*, 502 F.2d 1117 (6th Cir. 1974), overruled by *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626 (6th Cir. 1978); and, *Riha v. Jasper Blackburn Corp.*, 516 F.2d 840 (8th Cir. 1975). However, it has been consistently demonstrated that expert evidence is essential to accurate economic forecasting. Since it is apparent that the middle–ground approach contributes little to the accuracy or predictability of lost future earnings, and paradoxically allows a judge or jury to determine what an acknowledge expert cannot, we decline to adopt it.

The evidentiary approach in its several variants allows the factfinder to consider productivity and inflation in awarding damages. Since we believe that there is a reasonable basis in fact to consider the impact of inflation and productivity on lost future earnings, we conclude that the evidentiary concept is the most valid method to compute lost future earnings. However, courts employing the evidentiary method differ on the factors to be considered in assessing lost productivity on the one hand and the method to calculate the inflation component in the final lost future earning award on the other. Recognizing that there are myriad of ways to incorporate such economic data [18] we find that there are two versions appropriate for our consideration.

The first of these two variants of the evidentiary approach was developed by the court in *Feldman v. Allegheny Airlines*, 382 F.Supp. 1271 (D.Conn.1974), aff'd, 524 F.2d 384 (1st Cir. 1975). In *Feldman*, a surviving husband brought a wrongful death action as the administrator of his wife's estate. The defendant airline stipulated as to its liability and the trial was confined to the issue of damages. The

18. *See* e. g., *Turcotte v. Ford Motor Co.*, 494 F.2d 173 (1st Cir. 1974) (independent incorporation method); *Platis v. United States*, 288 F.Supp. 254, 277–78 (D. Utah), aff'd, 409 F.2d 1009 (10th Cir. 1969) (allowing a constant increase of $500 per year to account for future wage increases); *Brooks v. United States*, 273 F.Supp. 619, 635 (D.S.C.1967) (increased decedents last annual salary by 15% and spread this constant salary over decedents work expectancy).

court assumed that recovery for lost future earnings included the victim's lost earning capacity. In order to demonstrate the bases for the court's conclusions relative to what course the deceased's life probably would have taken, the court extrapolated the evolving pattern of Mrs. Feldman's life. The court detailed the deceased's college grades, her employment history, the opinion of the deceased held by her fellow workers, the expressed employment goals of the deceased and the potential jobs for which the deceased was qualified. The court also examined the employment history of another individual who had remarkably similar credentials as the deceased. The defendant produced one witness who testified as to the decedent's employment prospects. Based upon the above factors, the court predicted the incremental salary (productivity) increases of the decedent over her work–life expectancy.[19]

The court was then faced with the inflation component and the task of discounting the award to its present value. The court developed a formula known as the "offset present value method" in which it subtracted the estimated inflation rate from the discount rate to calculate the inflation adjusted or "real" rate of interest. Each year's earnings were

19. Based upon expert testimony that the decedent had an estimated 40 years remaining in her work–life and would probably retire at age 65, the court assigned dollar value to decedent's lost future earnings for each of the forty years. The court accomplished this task by utilizing the federal government GS pay scales, since this salary schedule was reflective of the potential earnings throughout the Washington metropolitan area.

"According to this valuation process, the value of the decedent's earning capacity for 'fiscal 1972,' the fiscal year beginning July 1, 1971, is the 1971 salary for the first step in GS–12, $15,040. This increases over the next four years, so that for fiscal 1976 the decedent's earning capacity is $17,044, the 1971 salary for the fifth step in GS–12. The decedent's earning capacity then remains unchanged over the next nine years–eight years of child rearing and the decedent's first year of employment thereafter. In 1986 the decedent's earning capacity goes up to the sixth step in GS–12, $17,545, and continues to rise thereafter one step at a time, with each change of grade being from the tenth step in one grade to the fifth step in the next higher grade. In the fortieth year, fiscal 2111, the decedent is at the seventh step of GS–16, with a 1971 salary of $33,757. See generally Table I, infra, p. 1298.
382 F.Supp. at 1287.

then discounted to present value by this "real" discount rate. The "real" discount rate employed by the court was 1.5%. The court rationalized its formula:

> ... on the basis of the evidence adduced at trial, the evidence judicially noticed and collated at the Appendix, and judicial notice of the continuing erratically inflationary behavior of the American economy, that 1.5 per cent per year is an appropriate figure by which to discount an award of damages based on the destruction of future earning capacity when that award has itself been computed without consideration of inflation affecting that amount subsequent to the date of the injury upon which the award is premised.

*Id.* at 1294–1295 [20]

The second variant of the evidentiary method was adopted by the Alaska Supreme Court in *Beaulieu v. Elliott*, 434 P.2d 665 (1967), and refined in *State v. Guinn*, 555 P.2d 530 (1976). Pursuant to this formula, the Alaska courts first calculate lost future earning capacity of the victim over his or her work–life expectancy. As to productivity, the Alaska court has stated: "Automatic step increases keyed to the length of service are by their very nature certain and predictable at the time of trial" and the court takes them into account when estimating the lost future earnings. *State v. Guinn*, 555 P.2d at 546. However, the court excluded as speculative evidence the "non–scheduled salary increases and bonuses

**20.** The appellate court summarized the district court's process as follows:

> "In calculating the discount rate, the appellee's expert, relied on by the district court, used an average earnings of 4.14% (from mutual savings bank investments) as representative of a prudent, non–sophisticated investment and subtracted 2.87% as the average yearly inflation rate revealed in the Department of Labor's Consumer Price Index over an 18–year period, yielding a 1.27% difference which was rounded up to 1.5%. Judge Blumenfeld corroborated this 'inflation–adjusted discount rate' of 1.5% by calculating the real yields of investments since 1940 in federal government securities (with inflation factored out) from the 1974 Economic Report of the President, a source referred to by appellant Allegheny's expert."
>
> *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 387 (2nd Cir. 1974).

that are granted as one progresses in his chosen occupation in terms of skill, experience and value to the employer." *Id.*

In order to account for the inflationary component's impact on lost future earnings and the effect of future interest rates on lump–sum payment, the Alaska court applied that "total offset method." Under the total offset method, a court does not discount the award to its present value but assumes that the effect of the future inflation rate will completely offset the interest rate, thereby eliminating any need to discount the award to its present value.

## IV. Discussion

Mindful of our goal that a damage award formula should strive to be efficient, predictable as well as accurate, in computing lost future earning capacity this Commonwealth adopts the *Feldman* court's approach to calculating lost productivity and the Alaska court's total offset approach to inflation and discounting to present value.[21] We believe that this eclectic method best computes a damage award which will fairly compensate a victim to the full extent of his or her injuries and avoids unnecessary complexities likely to produce confusion although in reality contributing little to the degree of accuracy to be obtained. Although judges and juries are not fortune tellers equipped with crystal balls, the *Feldman* approach to determining productivity as a factor in awarding future lost earning best approximates the soothsayers by presenting the triers of fact with all relevant evidence. After laying a proper foundation, expert and lay witnesses are called upon to testify as to the victim's past and future employment possibilities. The defense may cross–examine the plaintiff's witnesses and present evidence on their own behalf. Upon a thorough evaluation of all the

21. This Commonwealth now requires that a damage award be discounted to its present value by using six percent simple interest figure. We do not wish to disturb this requirement in calculating future damages in other contexts. We refrain "from attempting to fashion broad general rules as a panacea. The obviously wiser course is to resolve disputes on a case–by–case basis until we develop, through experiences in [an] area, a sound basis for developing overall principles." *Pa.L.R.Bd. v. State College Area School District*, 461 Pa. 494, 500, 337 A.2d 262, 265 (1975).

evidence presented, the factfinder makes an informed estimation of the victim's lost earning capacity.[22] Although this approach may be time consuming, and like all estimations of future events may be subject to a degree of speculation, it is exceedingly more accurate to assume that the future will not remain stagnant with the past.

We cannot embrace the Alaska court's restrictive method of computing productivity as a component of lost future earnings since the Alaska court limits its inquiry to those step advances keyed to the length of service. The Alaska court's refusal to consider the possibility of merit based increases, unfairly discriminates against those victims whose salary is dependent on their skill, experience, and value to their employer. Moreover, it appears that the Alaska court's conception that merit based increases are "speculative" is a throwback to the previously rejected traditional approach.

In support of our adoption of the "total offset method" in allowing for the inflationary factor, we note that it is no longer legitimate to assume the availability of future interest rates by discounting to present value without also assuming the necessary concomitant of future inflation. We recognize that inflation has been and probably always will be an inherent part of our economy. Although the specific rate of inflation during any given period may vary, we accept the fact that inflation plays an integral part in effectuating increases in an employee's salary, and we choose to adopt a damage formula which will allow for that factor without actually requiring the factfinder to consider it as an independent element of the award.

Current economic theory demonstrates the accuracy of the total offset approach to inflation. As previously noted, the total offset method assumes that in the long run, future inflation and the discount rate will offset each other. "At

**22.** This tailor–made approach to lost earing capacity is accepted by many jurisdictions, even those jurisdictions which do not admit evidence of inflation on the grounds that it is speculative. *See Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422 (5th Cir. 1977).

first blush the rough and ready approach seems too obviously to invite the objection that it is far less precise than Judge Blumenfeld's (*Feldman* approach) and over-compensates the plaintiffs." Fleming, 26 Am.J.Comp.L. at 69. However, critics of the total offset approach fail to realize that future inflation rates and future interest rates do not exist in a vacuum, but co-vary significantly. *Inflation: A Survey*, 85 Econ.J. 741, 788 (1975). It can be stated with assurance that present interest rates depend at least in part upon expectations of future inflation. The mechanism for the adjustment was explained by economist W. E. Gibson:

> "When inflation becomes expected, lenders expect the real value of their principal and interest payments to be depreciated and borrowers expect to be able to repay loans with money for which less real value must be sacrificed than before expectations changed. Thus at any level of market interest rates the quantity of loans supplied decreases while the quantity demanded increases. Both forces increase nominal interest rates."

Gibson, *Interest Rates and Inflationary Expectations: New Evidence*, 62 Am.Econ.Rev. 854, 855 (1972).

Modern interest theory commends the accuracy of the total-offset method:

> "[W]hen prices are rising, the rate of interest tends to be high but not so high as it should be to compensate for the rise; and when prices are falling, the rate of interest tends to be low, but not so low as it should be to compensate for the fall."

I. Fisher, *The Theory of Interest* 43 (1930).

Since over the long run interest rates, and, therefore, the discount rates, will rise and fall with inflation, we shall exploit this natural adjustment by offsetting the two factors in computing lost future earning capacity. *Accord, Freeport Sulphur Co. v. S. S. Hermosa*, 526 F.2d 300, 310 (5th Cir. 1976) (concurring opinion). We are satisfied that the total offset method provides at least as much, if not greater, accuracy than an attempt to assign a factor that would reflect the varying changes in the rate of inflation over the

years. Our experiences with the use of the six percent discount rate suggest the difficulties inherent in such an approach. As to the concomitant goals of efficiency and predictability, the desirability of the total offset method is obvious. There is no method that can assure absolute accuracy. An additional feature of the total offset method is that where there is a variance, it will be in favor of the innocent victim and not the tortfeasor who caused the loss.

The superiority of the total offset approach becomes apparent upon comparison with the offset present value method. In *Feldman*, rather than forecasting the impact of inflation on future earnings, through the use of an inflation adjusted interest rate, Judge Blumenfeld discounted future earnings based upon 1971 dollars. However, from an analysis of the formula involved, it appears that predicting prospective interest rates is as difficult as forecasting future inflation. *Freeport Sulphur Co. v. S. S. Hermosa*, 526 F.2d 300, 310 (5th Cir. 1976) (concurring opinion). Notably, the merit of discounting to present value upon an inflation adjusted interest rate was questioned by the very court which originally proposed it.

"... [S]ince Connecticut law requires the discounting to present value of damages for the destruction of future earning capacity, and since such discounting demands assessment of the future earning power of money, the Court is compelled to engage in economic forecasting despite the inexactitude of the dismal science's soothsaying. It is not open to this Court to decide that the ascertainment of a discount rate has become too speculative to be fair, and that the statutory mandate of awarding 'just damages' for wrongful death would be better served by dispensing with the discounting process altogether.

382 F.Supp. at 1293 n.30

Moreover, the complexities inherent in factoring the inflation out of the market rate of interest moved Judge Blumenfeld to observe that: "Nothing is more conclusively established by the instant memorandum of decision than the

difficulty of ascertaining the amount of damages due in this case. . . ." 382 F.Supp. at 1295.[23]

An additional virtue of the total offset method is its contribution to judicial efficiency. Litigators are freed from introducing and verifying complex economic data. Judge and juries are not burdened with complicated, time consuming economic testimony. Finally, by eliminating the variables of inflation and future interest rates from the damage calculation, the ultimate award is more predictable.

## V. Conclusion

■ Henceforth, in this Commonwealth, damages will be awarded for lost future earnings that compensate the victim to the full extent of the injury sustained. Upon proper foundation, the court shall consider the victim's lost future productivity. Moreover, we find as a matter of law that future inflation shall be presumed equal to future interest rates with these factors offsetting. Thus, the courts of this Commonwealth are instructed to abandon the practice of discounting lost future earnings. By this method, we are able to reflect the impact of inflation in these cases without specifically submitting this question to the jury.

In view of the trial court's refusal to permit appellant to introduce evidence relating to a future productivity factor and our formulation of a new standard to be used for accommodating inflation in these cases, we reverse the judg-

**23.** One critic of the independent offset method explained that:

"Feldman also is flawed from a practical standpoint. According to the court's own calculations, sudden changes in the price level have caused the real rate of interest to vary from -2.9 percent to +2.0 percent on short term Treasury bills, and from -8.9 percent to +3.7 percent on long term federal notes. Faced with these variations in the real rate of interest, the trial judge should have been wary of selecting an inflation adjusted discount rate. Instead, the judge simply assumed a stable rate of inflation, a condition historically associated with a real yield of two percent, and arbitrarily lowered the real rate of interest to one—and—a—half percent to allow for unforeseeable fluctuations. The Feldman approach clearly required strong assumptions about both future rates of inflation and future rates of real interest."
63 Va.L.Rev. at 105.

ment below and remand the cause for a new trial as to the damage question.

ROBERTS, J., filed a concurring opinion.

FLAHERTY, J., filed a concurring and dissenting opinion.

ROBERTS, Justice, concurring.

I agree with the majority that the practice of reducing to present value the lost future earnings component of personal injury awards should be abrogated and the "total offset" rule adopted in its stead. The practice of reducing to present value is unrealistic in its failure to take into account either future inflation or deflation. See generally Restatement (Second) of Torts § 913A Comment at p. 492 (1979). Though perhaps somewhat imprecise, the total offset rule will fairly accommodate parties in both inflationary and deflationary times. So too, the total offset rule "has administrative simplicity to recommend it, since it avoids rather complex calculations involved in reducing to present value." D. Dobbs, Remedies § 8.7 at p. 575 (1973). Indeed, any person who has heard a court's "present value" charge will attest to the wisdom of abrogating the practice. See *Brodie v. Philadelphia Transportation Co.*, 415 Pa. 296, 203 A.2d 657 (1964).

I also agree with the majority that a jury may consider evidence of a victim's lost future earning increases. It is my understanding, however, that Pennsylvania law has long permitted jury consideration both of earning decreases and of earning increases. For example, Proposed Jury Instruction 6.22 (Civil) on "Earnings Fluctuations" provides:

"If you find that the plaintiff will suffer an impairment or loss of earning power as the result of this accident ..., you may take into consideration possible fluctuations with respect to such losses. In other words, if you find that the plaintiff's ... wages would have increased or decreased over the years, you will take that factor into consideration so that proper compensation can be made."

Pennsylvania Supreme Court Committee for Proposed Standard Jury Instructions Subcommittee Draft—October 14, 1973. See also e.g., *McCaffrey v. Schwartz*, 285 Pa. 561, 132 A. 810 (1926), overruled on other grounds, *Brodie v. Philadelphia Transportation Co.*, supra; Robert M. Bernstein, "Damages in Personal Injury and Death Cases in Pennsylvania," 23 Pa. Bar Ass'n Q. 9 (1951).

It should also be observed that today's result does not mandate jury verdicts reflecting only earning increases. Within accepted rules of evidence, both sides are free to offer competent and relevant proof to establish their respective positions as well as to challenge the evidence offered in opposition.

Finally, today's result does not represent the exclusive means of taking future economic factors into account in cases of larger damage awards covering losses over future years. For example, special findings of fact may be helpful in making certain that neither the tortfeasor not the injured is unduly prejudiced or benefited by future economic conditions. Also, at least thirteen states, including California, Delaware, Florida, and Maryland, have enacted laws allowing for some form of periodic payments in medical malpractice actions. See T. Elligett, "The Periodic Payment of Judgments," 46 Ins. Counsel J. 130, 134 n.49 (1979). Very recently the National Conference of Commissioners on Uniform State Laws adopted an approved draft of a "Uniform Periodic Payment of Judgments Act" which authorizes installment payment of awards in personal injury cases. See generally Roger C. Henderson, "Periodic Payments of Bodily Injury Awards," 66 A.B.A.J. 734 (1980). Installment payment provisions of the uniform act

> "eliminate[ ] the guesswork and speculation involved in the lump–sum system when the jury is asked to discount awards of future damages to present value and, in an increasing number of jurisdictions, predict future rates of inflation. Since damages will be paid as losses accrue, there is no need to discount to present value. With regard to inflation, the act provides for adjustments in the unpaid

installments so that the damages award is not eroded by inflation."

Id. at 736. Appropriate common–law approaches, including special findings, installment payments, and the like, may, of course, be fashioned to assure that full and real effect is given to the adjudication of liability and damages. See e.g., *Ellenbogen v. County of Allegheny*, 479 Pa. 429, 438, 388 A.2d 730, 734–35 (1978); W. Schaefer, "Precedent and Policy," 34 U.Chi.L.Rev. 3 (1966).

FLAHERTY, Justice, concurring and dissenting.

While I fully concur in the view that *Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976), should be unceremoniously eliminated from the law of this Commonwealth as unrealistic, I must dissent to the majority's adoption of what it calls the "total offset method", a "per se rule" of doubtful validity. True, such an approach is a simple one, but it does not achieve justice, and, has only been adopted in one jurisdiction, i.e., Alaska. We should simply permit expert testimony on the issues of inflation *and* productivity. Such testimony, on both sides of the issue, is, of course, subject to cross–examination and argument as to its validity and weight. Thus, the jury is free to weigh the evidence before it and render its verdict. This is also simple, and provides justice in accordance with our time honored principles.