Sandra K. BARNES and Robert E. Barnes, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 80–425.

United States District Court, W. D. Pennsylvania.

June 29, 1981.

---

James L. Weisman, Weisman, Pass, Swartz & Trimm, Pittsburgh, Pa., Brendan V. Sullivan, Jr., Williams & Connolly, Washington, D. C., for plaintiffs.

Craig R. McKay, Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COHILL, District Judge.

### I.

#### *Background*

Plaintiff, Sandra K. Barnes, suffered Guillain-Barre Syndrome as a result of a shot she received during the 1976 United

7

States swine flu inoculation program. She is permanently crippled and confined to a wheelchair.

The defendant, the United States of America, has admitted liability for her injuries. The only issues to be determined in this non-jury case relate to the damages to be awarded.

Robert E. Barnes, Mrs. Barnes' husband, seeks damages for loss of consortium.

The case was brought before the Court pursuant to the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b (1976), the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (1976), and 28 U.S.C. § 1346(b) (1976).

Pursuant to Fed.R.Civ.P. 52, we make the following Findings of Fact and Conclusions of Law.

## II.

### Findings of Fact
#### A. Overview

In this case the defendant has conceded that Mrs. Barnes suffered from Guillain-Barre Syndrome caused by receiving a swine flu shot and has admitted liability.

The National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b (1976), was an attempt by the Federal Government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history, and over forty-five million Americans— or one-third of the adult population—were vaccinated. The initial vaccinations occurred on October 1, 1976; the program was suspended on December 16, 1976.[1] The program, for which $135 million was initially appropriated by Congress, called for using both private and public health care sys-

tems to achieve its goal of inoculating the entire adult population by the end of November, 1976. The November deadline was critical since the season of intense flu transmission in the United States is generally considered to be September through March. See The Swine Flu Program: An Unprecedented Venture in Preventive Medicine, Report to Congress by the Comptroller General of the United States, June 27, 1977.

The Swine Flu Act became law on August 12, 1976 and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:

1. The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation, 42 U.S.C. § 247b(k)(2)(A);

2. it makes that cause of action the exclusive remedy, 42 U.S.C. § 247b(k)(3), and it abolishes any cause of action against the vaccine manufacturer; and

3. it makes the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act, 42 U.S.C. § 247b(k).

The program was prompted in part by the medical discovery in early February, 1976 at Fort Dix, New Jersey, of military personnel having a new strain of influenza virus antigenically related to the virus prevalent during the 1918–19 swine flu pandemic. That pandemic was responsible for twenty million deaths worldwide, including 400,000 in the United States alone.[2] Prior to 1930, the 1918–19 strain was the predominate cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional

---

1. *Administration of the National Influenza Immunization Program of 1976*, Final Report to Congress by Department of Health, Education and Welfare (1978).

2. It was widely thought by epidemiologists that antigenic shifts in the influenza virus were likely about once every decade. There had been

shifts in 1957 and 1968 both followed by pandemics—Asian Flu and Hong Kong Flu respectively—and public health officials were expecting another by 1978 or 1979. Neustadt & Fineberg, *The Swine Flu Affair*, published by Department of Health, Education and Welfare, 1978, p. 6.

transmission from swine to human and no secondary person-to-person transmission.[3]

In addition, the Swine Flu Act was occasioned by the collapse of the commercial liability insurance market, both for vaccine manufacturers and other program participants.[4] The cases of *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968), and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), which held a manufacturer of polio vaccine strictly liable in tort, greatly contributed to the insurance problem. For this reason, the Swine Flu Act provided that the exclusive remedy for injury caused by the vaccine would be against the United States. However, since the manufacturers could still insure themselves against negligence liability, they may be liable in a suit by the United States if the United States is found liable on a negligence theory. 42 U.S.C. § 247b(k)(7).

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–77. As can be expected, many people who were inoculated also incurred some type of illness, injury or adverse medical condition in a period relative to the vaccination. Lawsuits such as the instant one, were filed throughout the country for illnesses allegedly resulting from the immunization. In addition, numerous administrative claims have been filed. The critical question presented in these cases is the causal relationship between the immunization from the claimed illness. However, mere *temporal* relation between the onset of a disease and the vaccination is insufficient to establish legal causation. In the case of Guillain-Barre Syndrome, the government has stipulated that the swine flu vaccine can cause Guillain-Barre Syndrome in some instances, and it has so conceded here.

Guillain-Barre Syndrome is a neurologic disorder, inflammatory in nature, which affects the peripheral, as opposed to the central, nervous system. The syndrome characterizes a set of neurologic symptoms rather than defining a specific organic disorder. The disease was first described in 1859 by Dr. O. Landry, and referred to as "Landry's Paralysis." [5] It was again described in 1916 by Drs. Guillain, Barre and Stohl.[6] To date, medical science has not established the syndrome's exact etiology or cause.

Based on the literature we have reviewed, Guillain-Barre Syndrome generally has these characteristics:

1. it is a neurologic disorder which affects the peripheral nervous system and nerve roots;

2. the primary clinical symptoms are symmetrical motor weakness and reflex impairment;

3. sensory impairment is typically negligible;

4. the primary laboratory symptoms are elevated protein levels in the cerebrospinal fluid and decreased nerve conduction rates; and

5. the disease usually peaks within one month of onset followed by recovery without permanent motor malfunction.

---

3. *Id.* at 147.

4. Exhaustive analyses of the Swine Flu Immunization Program and its relationship to Guillain-Barre Syndrome were made by Judge Sherman G. Finesilver. *See Bean v. United States*, 79–F–571 (D.C.Colo. Aug. 19, 1980); *Alvarez v. United States*, 495 F.Supp. 1188 (D.C. Colo.1980).

5. Leneman, *The Guillain-Barre Syndrome: Definition, Etiology and Review of 1100 Cases* Arch., Int. med., 118:139–144 (1966).

6. Other common designations for this disease include idiopathic polyneuritis, acute febrile polyneuritis, infective polyneuritis, postinfectious polyneuritis, acute toxic polyneuritis, acute polyneuritis with facial diplegia, acute infectious neuronitis, polyneuronitis, mononeuronitis, radiculoneuritis, polyradiculoneuritis, Guillain-Barre-Stohl Syndrome, Landry-Guillain-Barre-Stohl Syndrome. *See* Arnason, Barry G.W., Textbook entitled *Inflammatory Polyradiculoneuropathies*, Chapter 56, at page 1110. (M.D.L. Document No. 103). This will be hereinafter referred to as "*Arnason*" with the page number.

The NINCDS[7] *ad hoc* committee has advanced criteria for the diagnosis of Guillain-Barre Syndrome. Features required for diagnosis of Guillain-Barre Syndrome within the NINCDS guidelines are progressive motor weakness of more than one limb and areflexia (loss of tendon jerk). Universal areflexia is the rule, although distal areflexia with weakening of the reflexes in the biceps and knees will suffice if other features are consistent.

Various descriptions of Guillain-Barre Syndrome are listed in the medical dictionaries:

*The Attorney's Dictionary of Medicine* (Schmidt 1978) defines it as

[a] neurological disorder of unknown cause due to a virus, sensitivity to a virus, or to a perverse immunological reaction of the body to constituents of certain vaccines, resulting in allergic neuritis (inflammation of nerves) and the destruction of myelin (a fatty substance covering some nerve fibers).

*The Merck Manual* (13th Ed. 1977) states: Symptoms begin peripherally, often in the digits, and progress centrally. Although numbness, tingling, and other paresthesias are common and there may be mild distal sensory loss, flaccid muscular weakness predominates, with associated muscle tenderness, and diminished tendon reflexes. The weakness often ascends from legs to arms to face. The sphincters usually escape. In severe cases, motor cranial nerves and trunk muscles may be involved and respiration may be impaired. Sympathetic involvement is indicated by hyperhidrosis, edema, a livid skin, and postural hypotension. The respiratory paralysis and autonomic deficits may be life-threatening.

The interval between the prodromal infectious episode and the onset of symptoms is variable; most frequently it is one to three weeks. On occasion the interval between the infection and the onset of Guillain-Barre Syndrome may be less than one week. Typically, those cases are the most acute. It should be pointed out that the infectious illness has usually subsided by the time the neuropathic symptoms surface. *Arnason* at 1110.

The most significant clinical features of Guillain-Barre Syndrome are progressive bilateral[8] motor weakness and areflexia. *See* NINCDS Criteria, *supra.* The severity of weakness covers a wide spectrum from mild ataxia (failure of muscle coordination) to total paralysis of every motor and cranial nerve. In most instances, the weakness is first noticed in the legs and gradually ascends through the body. Rarely are there solely sensory symptoms in the absence of motor debility. Tendon reflexes are usually abolished in affected areas although a flicker of activity may remain in mild cases. *Arnason* at 1121–1123.

Other clinical symptoms include facial diplegia, impaired swallowing and chewing, and respiratory difficulties.

The onset of symptoms is typically subacute. Evolution of the syndrome is complete after two weeks in over fifty percent of the cases; after three weeks in eighty percent; and after four weeks in ninety percent. In other words, the disease peaks within one month of onset in a vast majority of the episodes. A stable period of brief duration precedes the recovery phase that usually advances to completion within a period of weeks to a few months.[9] Satisfactory recovery occurs by the end of four to six months in eighty-five percent of the cases, although some patients show permanent deficits of varying severity. *Arnason* at 1121.

B. *Sandra K. Barnes' Personal and Medical History*

Plaintiff, Sandra K. Barnes, was born on March 5, 1950 in Strattonville, a small town

7. NINCDS is the acronym for National Institute of Neurological Communicative Disorders and Stroke. (M.D.L. Document No. 589).

8. A symmetrical pattern is prevalent in classic Guillain-Barre Syndrome although it is not absolute. *Arnason* at 1121.

9. One group has mentioned a recovery period of six to thirty-six months. Peterson, Daly, Dion, *et al., Infectious Neuritis (Guillain-Barre Syndrome) in Children,* Neurology 9:533 (1959).

in Clarion County, Pennsylvania. She had three sisters and two brothers. The family later moved to Franklin, Pennsylvania. Her father was killed in an airplane crash when she was ten years old.

She had a remarkable record in Franklin High School. She was one of the best students in her class of 238, was active in extra curricular activities, scored in the 97th percentile in her Scholastic Achievement Tests and won several scholarships to attend Allegheny College, Meadville, Pennsylvania. At Allegheny she majored in math for three years; she switched her major to psychology and computer science in her senior year and graduated with a "C" average.

During the summers while in college she worked at Polk Center (at that time it was known as Polk State School and Hospital) near her home in Franklin. Polk Center is a residential institution for mentally retarded children and adults. The first two summers that she worked there she did custodial-type work, bathing, feeding and generally helping to care for female residents. The summer after her third year in college she began working in the recreational program, which involved camping, hiking, going on picnics and swimming with the residents.

She particularly liked this work, and her supervisor told her that she would be hired permanently following her graduation from college if she had a degree in one of the social sciences. This was when she changed her major from math to psychology her senior year. Because of this last minute change in majors she did not get her degree until August, 1972; otherwise she would have graduated in June, 1972. That summer she worked in patient care at Methodist Hospital in Meadville and took the courses necessary to graduate.

In September, 1972 she went back to Polk Center to work on a full time basis. She had a civil service job in therapeutic recreation, and was assigned to the aquatics program because of her athletic ability. For the next two years she took Polk Center residents swimming at the YMCA in Franklin in the winter and engage in swimming, camping and canoeing activities with them in the summer. Mrs. Barnes obtained a Red Cross rating as a Water Safety Instructor and took additional college courses relating to work with handicapped children.

Mrs. Barnes testified that her work kept her physically very active and on the move. There was virtually no sedentary work in connection with her job. When she started full time work at Polk Center in 1972 her base salary was about $8,000. By 1976 it was $14,049. (Plaintiffs' Ex. 58). She testified that she had expected to work all of her life.

Plaintiff's husband, Robert, was born February 27, 1941. He has lived in the Polk area all of his life. He is a high school graduate and has worked at Polk Center since 1960. He was employed first as an attendant, caring for patients, and later transferred to the maintenance staff. He worked in the boiler room of the hospital for one year as an apprentice, became a boiler room fireman and has since been promoted to plant mechanic and ultimately to operating engineer. His present salary is about $15,000 per year.

After Mrs. Barnes' illness he took a voluntary demotion back to plant mechanic from operating engineer where he now works 37½ hours per week, rather than the forty hours that the other job entailed. He makes less money as a result. He took the demotion to permit him to spend more time at home with his wife.

Prior to Mrs. Barnes' contracting Guillain-Barre Syndrome, their marriage was a very happy one. They were married in 1973 and purchased their home in 1975. They shared domestic duties with her doing most of the household chores and him cutting the grass and doing the outdoor maintenance. Mrs. Barnes also paid the bills and managed the family finances. They both worked at Polk, of course, and tried to coordinate their hours of employment so that they could be together the maximum amount of time. She had the option of working from 1 P.M. to 9 P.M. or 8 A.M. to 4 P.M.; he had to work three different shifts.

Their favorite recreational activity was camping. They got a "long" weekend every third weekend and would almost always go camping in the Allegheny National Forest near Tionesta, Pa. where they would hike, ride bicycles, swim and the like.

On summer vacations they would go to Ocean City, Maryland. Mrs. Barnes' sister-in-law owned a condominium there which she would let the Barnes use.

For recreation at home they would usually go out for dinner and to a movie. Mr. Barnes enjoys hunting and would hunt both deer and small game during hunting seasons. His family owns a primitive hunting lodge or cabin near Tionesta, Pennsylvania.

On September 18, 1976, their daughter, Kelly, was born; after her maternity leave from Polk, Mrs. Barnes went back to work on November 30, 1976.

Mrs. Barnes and her husband had figured out a work schedule between them that resulted in their needing a baby sitter only six hours per week (two hours on each of three days).

Just three days after returning to work, December 2, 1976, Mrs. Barnes got a swine flu shot at Polk Center. She continued to work without incident through December 23, 1976. On that day she had worked the three to eleven shift because there was a Christmas dance for the residents that evening. She helped prepare the food and even danced with some of the residents. She went to bed about midnight and woke up around 3 A.M. She testified that she had a headache and that her legs also ached. She was not particularly concerned, thinking that she had simply worked too hard.

During the course of the day, on the twenty-fourth, she got continually worse. She just wanted to lie down all the time. In mid-afternoon she went to get the baby and fell down. After that she was unable to walk. She called a physician at Polk Center (Dr. Edith Seckler) but was unable to get her, and then contacted her personal physician, Dr. William Fee. He told her that he would meet her in the emergency room in Franklin Hospital at 4 P.M. Mrs. Barnes was able to walk into the emergency room holding on to her husband's arm. These were the last independent steps she ever took. She is now confined to a wheelchair except when she uses crutches and complicated leg braces that completely envelop her thighs, lock at the knee and go down the backs of the calves and about three-fourths under each foot.

After Dr. Fee met her in the emergency room, he proceeded to do a spinal tap and had her do a deep breathing routine which caused her to hyperventilate and faint. Dr. Fee placed her in the intensive care unit of the hospital and had her attached to all of the usual intensive care monitoring devices. They attempted unsuccessfully to feed her intravenously, as a result of which her arms were black and blue. During the night she did not want to lie still, but hospital personnel kept telling her to because of the various devices to which she was attached.

The next day, Christmas, she was told to attempt to stand up, but she could not do it, even with the help of the nurses. It was a classic case of severe Guillain-Barre Syndrome, but unlike the majority of Guillain-Barre Syndrome victims who recover, Mrs. Barnes will never again enjoy a normal life.

She screamed and cried while in the intensive care unit to such an extent that they moved her to a bed in one of the other wards near a nurses' station. During the first week she had a high fever, chills, vomiting and an absence of bladder and bowel control. Her arms became progressively weaker, and her back, legs and head felt like "someone was splitting them apart."

Dr. Fee explained to her that he had diagnosed her condition as Guillain-Barre Syndrome and predicted that she would recover in about three weeks if the syndrome followed its usual course.

During her second week in the hospital the fever was reduced, and her vomiting subsided. She still could not stand or sit up and did not have sufficient strength in her arms to pull herself up. Nurses had to care for all of her bodily functions. A therapist would exercise her legs, explaining that she

had to keep them in shape until she was walking again.

Mrs. Barnes testified that at this point she was in a very depressed state, sad and lonely, although everyone expected her to recover fully. At the end of the second week Dr. Fee advised her that she should go to a rehabilitation center to get back the strength in her muscles.

She was moved by ambulance from the hospital to St. Vincent's Health Center in Erie, Pennsylvania on January 7, 1977, and she remained there four weeks, until February 4, 1977. She was under the care of Dr. Thelbert Mayer at St. Vincent's Health Center. While she had been in the Franklin Hospital she had only seen Kelly, the baby, once, and when she was moved to St. Vincent's she was much further away from home. This was the worst winter in years, and her husband, mother and other members of the family had a very difficult time traveling to Erie to visit. During the first two weeks she only saw her husband twice and her mother once.

While at St. Vincent's she still suffered extreme pain in her legs and heightened sensations of pain. They put an air mattress on her bed to help lessen the pain. During her first two weeks at St. Vincent's she still had no bladder or bowel control. At this point the doctors were still predicting that she would enjoy a complete recovery in four to six weeks.

By her own testimony Mrs. Barnes described herself as a "terrible patient." She often became hysterical and talked to her husband on the telephone nearly every night, but often would scream at him and plead with him to get her out of the health center. During the last two weeks at St. Vincent's she was able to sit in a chair for a couple of hours each day, but the medical personnel had to place her in the chair. Part of her therapy was to be placed on a tilt table, strapped in and tilted up. During the second two weeks she started to relearn how to use the upper part of her body

again. She could wash her face and hands and put on a shirt. Her arms began to feel a little better. She could propel herself in a wheelchair, but only for a space of five feet and then she would have to rest.

On February 4, 1977, she was moved to Oil City Hospital, about fifteen miles from her home, where she remained until March 4, 1977, under the care of Dr. Robert Pilewski.

While at the Oil City Hospital she regained her bowel and bladder control. She was somewhat happier because she could see her baby each weekend and had lots of other visitors. During the last three weeks there she concentrated on self-care, learning to get in and out of bed with a transfer board [10], feeding and washing herself and learning to use a bed pan.

Dr. Pilewski was encouraged by the fact that she had regained bladder control and predicted that she would be able to walk in one and one-half to two years. She was discharged from Oil City Hospital March 4, 1977, with a diagnosis of "Guillain-Barre Syndrome with paraplegia." She was taken home in an ambulance and moved into her house on a stretcher.

For the next two weeks she was in bed almost all of the time. Mr. Barnes had had some wooden ramps made to accommodate the wheelchair. A sister-in-law of Mr. Barnes cared for the baby.

Mrs. Barnes described herself as becoming depressed again, and on March 15, 1977 she took an overdose of Darvon, a pain killer that had been prescribed for her. In her words, she "didn't want to face life like this." She was admitted to Franklin Hospital and was there for two days.

By mid-1977 her outlook began to improve. They made some adjustments in the house to accommodate the wheelchair. They cut a leg off the bathroom sink so that she could wash there, although she was going to have to use a bed pan for another year since the wheelchair would not fit in

10. A "transfer board" is a plastic board laid by Mrs. Barnes between her bed and wheelchair or wheelchair and car. She then raises herself on her hands and humps herself along sideways from or to her wheelchair.

the bathroom. They moved the baby to another room which could take the wheelchair. From March to July, 1977 she started being able to do more in the wheelchair, and the baby, now about ten months old, learned to balance herself and hold on to Mrs. Barnes' lap in the wheelchair.

Therapists and nurses came to her home, and she worked very hard at attempting to regain the use of her leg muscles, but to no avail. On July 18, 1977, she went to Cleveland Clinic to be examined by Dr. Richard J. Lederman, a neurologist. After running electromylogram and other tests Dr. Lederman advised Mrs. Barnes that there was almost complete nerve loss in both legs and that it was highly unlikely that she would ever walk or totally recover.

Mrs. Barnes exercised every day so as to avoid losing what muscle use she had left. Her attitude became positive—if she was never to walk again, she wanted to stay in the best shape she could. She does not stay in the wheelchair more than two or three hours at a time to avoid getting pressure sores.

Mr. and Mrs. Barnes have made some other changes in their home. The bathroom was a major problem. They spent $9000 to install a toilet and shower in the basement and an electric lift to get Mrs. Barnes and the wheelchair up and down the basement stairs. They obtained the money by remortgaging their house for $7000 and borrowing the other $2000 from their families. It was not until the summer of 1978, some one and one-half years after the onset of her affliction, that Mrs. Barnes was able to use a toilet in her own home.

The other big problem was a method for her to get in and out of the house on her wheelchair. For this, they got a $10,000 home improvement loan from a savings and loan association and built a ramp from the house to their garage.

Many problems exist. Eight or ten times Mrs. Barnes has been marooned in the basement when she was by herself and the electricity went out due to storms.

She now has a car with hand controls which she can drive, but it is such an effort to get in and out of the car when she is by herself that she cannot do this more than once a day. She does not drive in the winter when there is snow, which in her part of the country means that she is virtually unable to drive in December, January and February because of the severe winters that they have.

Mrs. Barnes' condition caused great stress on her marriage. Mr. Barnes began to have a drinking problem in 1980, and there was a brief separation. Mr. Barnes underwent therapy, no longer drinks at all, and they seem to have molded their marriage now to fit her condition.

She testified that in her opinion their marriage has been strengthened by this experience. She now spends full time caring for the home, and for Kelly, their little girl. She spends one hour per day exercising her arms and the upper part of her body, one hour standing and using the braces previously described and one hour swimming or wheeling the wheelchair up the street. She will not use an electric wheelchair because she is afraid of losing strength in her arms. As she said, "What you don't use, you lose." She rests every day from between one-half to one hour.

She does not believe that she could handle a full-time job. She does not believe it would be feasible considering her physical limitations, and feels that her duties at home represent a full time job.

As part of the evidence in this case we viewed a one and one-half hour movie showing what Mrs. Barnes can and cannot do. We saw her going swimming at the YMCA in Oil City with Kelly. We saw her leave the house with Kelly, transfer herself by way of the transfer board into the car, folding the wheelchair laboriously and getting it into the back seat (the chair weighs fifty pounds) and driving the car. The operation of just getting into the car took about ten minutes. They went through the reverse procedure in Oil City and she wheeled the chair to the YMCA. In the swimming pool they have a hoist. The life-

guard helped her from the wheelchair into a canvas sling attached to the hoist. The lifeguard then swung her out over the water, and using a lever that appeared to work like a car jack, lowered Mrs. Barnes into the water where she disengaged from the sling and swam, using her arms only. The reverse procedure was used to lift her out of the water and into the chair.

She swims about twice a week; it's only a one-half hour drive between Franklin and Oil City, but the whole operation from home to the YMCA, swimming and back home takes about three hours.

The film depicted Mrs. Barnes doing her exercises, housework, cooking, shopping in a supermarket and the like. The obstacles to one in Mrs. Barnes' condition are numerous. What is a simple task to one without such a handicap can be a tremendous obstacle to her. To make the bed she sits in the middle of it, adjusts the covers, and works her way backward toward the wheelchair. She dresses in slacks by sitting in the bed, putting them over her feet and then rolling her body back and forth to work the slacks up her legs.

She has a specially made chair for her shower and must laboriously transfer from her regular wheelchair to the shower chair to take a shower.

We will not list here all of the many other examples of the manner in which Mrs. Barnes, her husband and Kelly have all accommodated themselves to her condition. Suffice it to say, she and they have made a remarkable and courageous effort.

### C. *Summary of Mrs. Barnes' Injuries*

When Mrs. Barnes received the swine flu shot on December 2, 1976 she was a healthy, twenty-six year old woman with a three-month old daughter and a financially rewarding job as a physical therapist.

It is tragically ironic that a person with her particular vocation should suffer the malady that she has. She has been converted from a healthy, independent and successful person into a handicapped person committed for the rest of her life to a wheelchair. Her legs might now best be described as being no more useful to her than would be two pieces of garden hose attached to her body.

Dr. John Brillman, a neurologist, testified that of some fifty cases of Guillain-Barre Syndrome that he has seen, Mrs. Barnes is the most severe except those that ended in death to the patient.

### D. *Injuries Sustained by Robert Barnes*

Robert Barnes has sustained injury by virtue of loss of consortium. His family life and activity were dramatically changed by the paralysis of Mrs. Barnes. He has undertaken many household duties previously performed by her, and his marital life has been severely altered.

### E. *Necessary Architectural Changes in the House*

The plaintiffs presented a drawing of proposed alterations to the house to accommodate Mrs. Barnes and the wheelchair. This was prepared by an architect, Harold Ray Best. The estimated cost was $129,580. (Plaintiffs' Ex. 62, 63 and 64).

The government conceded that certain alterations are necessary and also retained an architect, Robert Dale Lynch. Mr. Lynch reviewed Mr. Best's plan and presented an alternate plan, which he estimated would cost $70,665 (Government's Ex. A (pp. 28–34) and Ex. B through G).

We view these proposed alterations as intended, insofar as possible, to make the house as convenient for Mrs. Barnes now, as it was before she contracted Guillain-Barre Syndrome.

Many of the suggestions in Mr. Best's plan are desirable, but we do not feel that they are absolutely necessary. We believe that the plan submitted by Mr. Lynch, for the Government, could make the house suitable for Mrs. Barnes in her present condition.

■ We will therefore approve the Government plan and include $70,665 in the award of damages. On cross examination Mr. Lynch admitted that he had not included the usual 10% architect's fee in his estimate, and we will add $7,066.50 to the award as an architect's fee.

## F. *Damages*

### 1. *Out-of-Pocket Expenses*

■ All of the out-of-pocket expenses pertaining to Mrs. Barnes' illness have been stipulated to by the parties and total $43,956.43 as follows:

#### Medical Expenses to 6/15/81

| | | |
|---|---|---|
| Franklin Hospital | $2,986.35 | (Tr. Ex. 23) |
| St. Vincent Health Center | 5,090.03 | (Tr. Ex. 24) |
| Oil City Hospital | 2,734.25 | (Tr. Ex. 25) |
| Cleveland Clinic | 220.00 | (Tr. Ex. 26) |
| Dr. William Fee | 442.00 | (Tr. Ex. 27) |
| Dr. Arnold Z. Gold | 74.00 | (Tr. Ex. 28) |
| Dr. Robert M. Pilewski | 42.00 | (Tr. Ex. 29) |
| Dr. John A. Lange | 50.00 | (Tr. Ex. 30) |
| Dr. J. B. Johnston | 40.00 | (Tr. Ex. 31) |
| Dr. David S. Summers | 85.00 | (Tr. Ex. 32) |
| Dr. Fred Padin | 15.00 | (Tr. Ex. 33) |
| Venango County Visiting Nurses | 2,964.50 | (Tr. Ex. 34) |
| St. Vincent Urology Associates | 57.00 | (Tr. Ex. 35) |
| Rose Weidle, Therapist | 420.00 | (Tr. Ex. 36) |
| St. Vincents Hospital Therapy | 35.00 | (Tr. Ex. 37) |
| Total Medical Expenses to 6/15/81 | $15,255.13 | |

#### Home Improvements to 6/15/81 to Accommodate Existing Home to Wheelchair Living

| | | |
|---|---|---|
| Pittsburgh Elevator Co. (elevator installation) | $ 9,000.00 | (Tr. Ex. 38) |
| Sears, Roebuck & Co. (shower conversion & installation of bathroom grab bars) | 52.20 | (Tr. Ex. 39) |
| Latchaw's Plumbing & Heating (installation of two closets in basement) | 273.16 | (Tr. Ex. 40) |
| Harold Best (renovation to house—concrete ramp, porch, etc.) | 9,550.00 | (Tr. Ex. 41) |
| Total Improvements to 6/15/81 | $18,875.36 | |

#### Other Miscellaneous Expenses to 6/15/81

| | | |
|---|---|---|
| Pittsburgh Elevator Co. (elevator repair) | $ 218.00 | (Tr. Ex. 42) |
| The Easter Seal Society of Venango County | 300.00 | (Tr. Ex. 43) |
| Hotel (while visiting Cleveland Clinic) | 63.94 | (Tr. Ex. 44) |
| Heyl Physicians Supply Co. | 24.50 | (Tr. Ex. 45) |
| Miller's Garage (installation of hand controls) | 37.48 | (Tr. Ex. 46) |
| Gresham Driving Aids | 21.50 | (Tr. Ex. 47) |
| Miscellaneous bills for orthopedic equipment | 2,601.71 | (Tr. Ex. 49) |
| Green Orthotics (wheelchair equipment) | 205.95 | (Tr. Ex. 50) |
| Motel (while visiting Pennsylvania Rehabilitation Center) | 60.42 | (Tr. Ex. 51) |
| Total Miscellaneous Bills to 6/15/81 | $3,533.50 | |

Expenditures Incurred by Bureau of
Vocational Rehabilitation to 6/15/81

| | | |
|---|---|---|
| 8/14/77 | Physician's Records | $    8.00 |
| 8/19/77 | Physician's Records | 8.00 |
| 5/22/78 | Auto Hand Controls | 124.44 |
| 6/12/78 | Treatment at Penna. Rehab. Center | 132.00 |
| 6/12/78 | Driver Education | 66.00 |
| 6/12/78 | Maintenance at Penna. Rehab. Center | 64.00 |
| 8/31/78 | Wheelchair | 525.00 |
| 9/15/78 | Treatment at Penna. Rehab. Center | 242.00 |
| 9/15/78 | Maintenance at Penna. Rehab. Center | 48.00 |
| 9/25/78 | Shower Chair | 265.00 |
| 10/16/78 | Braces | 154.00 |
| 10/16/78 | Maintenance at Penna. Rehab. Center | 16.00 |
| 6/19/79 | Lofstrand Crutches | 25.00 |
| 6/19/79 | Aluminum Crutches | 13.00 |
| 12/11/79 | Long Leg Braces | 1,152.00 |
| | Total Expenditures to 6/15/81 | $2,842.44   (Tr. Ex. 52) |

**Child Care & Homemaker Costs to 6/15/81**

Mrs. Barnes is the mother of a three and a half year old female child.   Child care services were provided by Nancy Barnes, the sister-in-law of Mrs. Barnes, at a cost of approximately $2,000, which was below the normal rate.

| | |
|---|---|
| Child care costs to 6/15/81 (paid by cash) | $2,000.00 |
| Homemaker costs 11/77 thru 12/78 (paid by cash) | 750.00 |
| Homemaker costs 4/80 to 6/15/81 (paid by check) | 700.00 |
| Total Child Care & Homemaker Costs to 6/15/81 | $3,450.00 |

---

### 2.  *Lost Wages*

There are two categories of lost wages in this case: loss of wages to date and future economic impairment.  Plaintiffs presented Reuben E. Slesinger, PhD., an economist and full professor of economics at the University of Pittsburgh, to establish Mrs. Barnes' lost wages and future economic impairment.

■   The state employees and Commonwealth of Pennsylvania have a wage contract that expires July 1, 1983, so that we know precisely what Mrs. Barnes' earning expectation would be to that date.  (Plaintiffs' Ex. 55 and 57).  Dr. Slesinger computed this (Plaintiffs' Ex. 58), and we adopt that computation as correct.  Mrs. Barnes' lost wages from December 15, 1976 to June 15, 1981 (the first day of trial) are $75,-708.74.

■   Dr. Slesinger also testified that Mrs. Barnes' work life expectancy is now thirty years according to the 1970 U. S. Department of Labor, Bureau of Labor Statistics (Plaintiffs' Ex. 60), interpolated as follows: Mrs. Barnes is presently 31 years of age. She will be 35 in 4 years.  The work life expectancy for ever-married women in the labor force after the birth of last child at age 35 is 26.8 years.  (Table A–4 of Plain-

tiffs' Ex. 60). Dr. Slesinger rounded this off to 26, since Mrs. Barnes is presently slightly over 31 (31.33 years of age) and concluded that her work life expectancy would be four years to age 35 and 26 years thereafter for a total of 30 years.

Based on the Commonwealth's employee contract Mrs. Barnes' wages for the remaining life of the contract would be as follows:

| | |
|---|---|
| June 15, 1981—June 30, 1981 | $    732.00 |
| July 1, 1981—June 30, 1982 | 20,575.00 |
| July 1, 1982—June 30, 1983 | 22,221.00 |
| | $43,528.00 |

On July 1, 1983, Mrs. Barnes will have a work life expectancy of 28 years. Dr. Slesinger simply took her last annual wage, $22,221, and multiplied it by 28. We believe this is a reasonable approach and find that Mrs. Barnes' wages from July 1, 1983 to June 30, 2011, would be $622,188 or a grand total of $665,716 ($622,188 plus $43,528). (Plaintiffs' Ex. 58).

While the amount is great, we believe it is a conservative approach to the problem since Dr. Slesinger's computation does not speculate that Mrs. Barnes would have been promoted to a higher-paying position one or more times; neither does it contemplate salary raises encompassed in future contracts. Both of these possibilities are realistic. Mrs. Barnes had been a good worker and had been promoted during her first four years on the job. She probably would have been promoted again. As to future salary raises, in these days, salaries nearly always go up, and we believe that this finding of future lost wages of $665,716 is realistic.

### 3. Future Costs of Equipment to Accommodate Paraplegic Living

Mrs. Barnes has a present life expectancy of 48 years. Her life expectancy was 52 years at the time she was stricken. (Plaintiffs' Ex. 59, U. S. Department of Health, Education and Welfare, *Vital Statistics*, 1978, Table 5–13). There will, of course, be costs in the future related to wheelchairs, special auto equipment, therapeutic leg braces and the like.

Mrs. Barnes testified that she estimated these costs had averaged $1500 per year for the past four years. She estimated that this will cost $1000 per year in the future; we will adopt that estimate as reasonable and add $48,000 to the award for the cost of paraplegic equipment at the rate of $1000 per year for the next 48 years.

### III.

### Conclusions of Law

#### 1. Stipulation

As noted earlier, the parties stipulated that the government was liable to the plaintiffs, and the only issue is the amount of damages.

The plaintiff, Sandra K. Barnes, is entitled to damages for her pain and suffering, reasonable medical expenses and other expenses reasonably related to her condition. Plaintiff, Robert E. Barnes, is entitled to damages for the loss of the companionship, services and consortium of his wife.

#### 2. Collateral Source Rule

The government argued that it should be able to set off Social Security payments and state disability payments made in behalf of, or directly to, the plaintiffs. Under Pennsylvania law the "collateral source" rule permits a tort victim to recover more than once for the same injury provided the payments come from different sources. *Kagarise v. Shover,* 218 Pa.Super. 287, 289, 275 A.2d 855, 856 (1971).

Mrs. Barnes testified that she contributed both to Social Security and to a state disability insurance fund.

In *Smith v. United States,* 587 F.2d 1013 (3d Cir. 1978), a case arising from the Eastern District of Pennsylvania, the court held: "[W]here applicable state law recognizes the 'collateral source' doctrine, Social Security benefits should not be deducted from a recovery under the FTCA." *Id.* at 1014.

*Overton v. United States,* 619 F.2d 1299 (8th Cir. 1980), held that a plaintiff could not recover when the collateral source was a "Part A" trust fund of the Social Security Administration. This fund, however, repre-

sented money to which the plaintiff had not contributed. In the instant case plaintiff, Sandra K. Barnes, had contributed to the Social Security fund from which the payments she now receives are made.

In *Feeley v. United States*, 337 F.2d 924 (3d Cir. 1964), the court held that since both Veterans' Administration hospital benefits and Federal Tort Claims Act recoveries come out of general revenues of the United States, plaintiff was not entitled to both. As noted by Judge Stern, however, in *Smith v. United States, supra* at 1015, the *Feeley* court carefully restricted its holding to the facts of that case where the defendant, United States, had provided free hospital care for the injuries for which plaintiff was suing.

> The defendant United States has provided free hospital care for these specific injuries. While it is true that the plaintiff became entitled to the benefits because of his status as a veteran and his pre-existing service-connected disability, and not because he was the victim of a tort committed by a federal employee, the fact is that the United States has paid for the hospital care here in dispute, while the plaintiff has paid nothing for the care. To allow the plaintiff to recover for this item in his damages would not only result in a double-recovery for him, but also a double-payment out of the general treasury by the United States. We are careful, however, to limit this result to the facts of this case. This decision casts neither approval nor disapproval on such possibly distinguishable situations as where the payment is out of a specially funded source, see *United States v. Harue Hayashi*, 282 F.2d 599 (9 Cir. 1960), or where the plaintiff has paid a part or all of the premiums necessary to establish the source or fund. See *United States v. Brooks*, 176 F.2d 482 (4 Cir. 1949).

*Feeley v. United States*, 337 F.2d 924–934 (3d Cir. 1964).

■ Accordingly, we hold that the United States is not entitled to any set off or reduction for any Social Security or state disability payments received by Mrs. Barnes.

### 3. Duty to Mitigate Damages

The government also argued that any award for future lost wages should be reduced by the amount Mrs. Barnes could earn in the future.

The government's theory is that the plaintiff is an extremely intelligent and accomplished woman. As previously noted, we would agree with that assessment. In addition the government states that she has made a "remarkable recovery, given her paralysis." From this the government argues that Mrs. Barnes has a duty to seek employment to mitigate damages. The government introduced the testimony of Paul A. Anderson, Director of Clinical Services of Vocational Rehabilitation Services, Inc., Harrisburg, Pennsylvania. Mr. Anderson testified that jobs are available for persons having a disability such as that of Mrs. Barnes and testified that employment would be available for her in many fields: her old job as a therapeutic activity worker, mathematics tutor, employment interviewer, director of volunteer services, programmer-information systems, salary administrator, proof machine operator, savings account/Christmas Club clerk, intake specialist and assessment specialist.

He named ten specific jobs and seven potential employers with salaries varying from $3.35 per hour to $18,000 per year for which she might apply. (See Defendant's Ex. A, pp. 2–10).

■ The government also argued that if Mrs. Barnes were suing the United States for discriminatory failure to hire under federal law, we would be hard-pressed to find her unfit for employment. This may be true, but we do not believe that Mrs. Barnes has a duty to mitigate damages by seeking employment in her situation.

She was gainfully employed, a new mother, and, according to her testimony, anticipated being employed for the indefinite future. Guillain-Barre Syndrome changed her life tragically. We do not believe that

she has voluntarily removed herself from the work force. Rather, this has been forced upon her.

Pennsylvania cases have held that a partially disabled person must seek employment in order to mitigate damages. *See* 11 Pennsylvania Law Encyclopedia, Damages § 36 (1970). We have found no case, however, where it was held that a plaintiff in the physical condition of Mrs. Barnes should seek employment or suffer a reduction in the award of damages. Dr. Pilewski, Mrs. Barnes' physician at Oil City Hospital, testified that in his opinion she should not take employment. We hold that she has been involuntarily removed from the work force.

Although she has dealt with her handicap in remarkable fashion, as evidenced by the movie presented at the trial, we have no doubt that Mrs. Barnes must be considered a totally disabled person for purposes of computing damages. We believe it would be unjust to assume that Mrs. Barnes is employable and to reduce the award by some amount arrived at purely through speculation.

4. *Reduction of Award to Present Value*

The Supreme Court of Pennsylvania recently reversed and overruled the settled law of the Commonwealth by setting aside the Pennsylvania rule that required reducing to present worth damage awards in personal injury actions. *See Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980).

■ The United States argues that we should not follow that holding. We believe that we are bound by *Kaczkowski v. Bolubasz, supra.* The National Swine Flu Immunization Program legislation provides that the United States shall be liable in tort for injuries arising out of the administration of swine flu vaccine. 42 U.S.C. § 247b(k)(2)(A). It further provides that swine flu actions are deemed to be actions brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80. 42 U.S.C. § 247b(k)(5)(A). The FTCA provides in section 1346(b), that in a damage action against the United States for "personal injury or death caused by . . . negligent or wrongful act or omission" the court is to

look to the law of the place "where the act or omission occurred." *See Mosley v. United States*, 538 F.2d 555 (4th Cir. 1976); *Smith v. Pena*, 621 F.2d 873 (7th Cir. 1980). *See also* 28 U.S.C. § 2674.

We will therefore compute the award for damages without regard to reduction of the award to present value.

5. *Pain and Suffering*

We have described at length Mrs. Barnes' situation and the manner in which she and her family have adjusted to it. There would be little point in discussing it further.

This case is fraught with tragic irony. Here is a bright, lively, young mother, formerly employed as a physical therapist, reduced to virtual helplessness. She suffers now and permanently from the sort of disability that she had tried to help others overcome in their own lives.

Money is not a substitute for what she and her family have lost, but nevertheless Congress provided for such an eventuality in the legislation creating the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(k)(2)(A). Mrs. Barnes and her husband are entitled to compensation for what they have lost.

■ Mrs. Barnes suffered untold pain and hardship the first two years following being stricken. We will award her the sum of $2000 per month for this period of time.

For the two and one-half years immediately preceding the trial the pain she suffered lessened somewhat, but she nevertheless had to work hard to acquire the strength in the upper part of her body to compensate for the complete loss of use of the lower half. We will award her the sum of $1500 per month for this period of time.

Mrs. Barnes' life expectancy is now 48.5 years. (Plaintiffs' Ex. 59, U.S. Department of Health, Education and Welfare, *Vital Statistics*, 1978, Table 5–13).

We will award her the sum of $1000 per month for the period July 1, 1981 to March 1, 2029, the month of her birthday in forty-eight years.

The award for pain and suffering may be summarized as follows:

| | | |
|---|---|---|
| December 26, 1976—December 30, 1978 | 24 months at $2000 | $ 48,000 |
| January 1, 1979—June 30, 1981 | 30 months at $1500 | 45,000 |
| July 1, 1981—March 1, 2029 | 573 months at $1000 | 573,000 |
| | Total | $666,000 |

### 6. *Loss of Consortium*

■ Loss of consortium is, perhaps, the most difficult of all damages to measure. Based on the difficulties Mr. Barnes has experienced, and the manner in which he has had to put self-interest aside to help care for his wife and their household, we believe an award of $200,000 for loss of consortium is justified.

### IV.

### *Summary*

The damages awarded in this action may be summarized as follows:

To the plaintiff, Sandra K. Barnes:

| | | |
|---|---|---|
| Medical expenses | $ | 15,255.13 |
| Home improvements to June 15, 1981 | | 18,875.36 |
| Miscellaneous expenses | | 3,533.50 |

| | |
|---|---|
| Bur. of Vocational Rehabilitation Expenses | 2,842.44 |
| Child and Homemaker costs | 3,450.00 |
| House alterations | 77,731.50 |
| Lost wages to June 15, 1981 | 75,708.74 |
| Future lost wages | 665,716.00 |
| Future cost of paraplegic equipment | 48,000.00 |
| Pain and suffering | 666,000.00 |
| Total | $1,577,112.67 |

To the plaintiff, Robert E. Barnes:

| | |
|---|---|
| Loss of consortium | $ 200,000.00 |