## Lach *v.* Fleth, Admr., Appellant.

Argued January 5, 1949. Before MAXEY, C. J., DREW, STERN, PATTERSON, STEARNE and JONES, JJ.

*Harry C. Hubler*, for appellant.

*David J. Reedy, Jr.*, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, March 24, 1949:

Plaintiff brought an action of assumpsit against the administrator of the estate of Minnie B. Potter, deceased, for services which he claimed he performed for

her from August 21, 1930, until the date of her death on February 22, 1945. Mrs. Potter's son, Ralph, died on August 21, 1930. Mrs. Potter was a widow. At the time of Ralph's death he was engaged to a woman who later married a man named Hafner. She appears in this case as Mrs. Irene Hafner, a witness. It is claimed that after Ralph Potter's funeral on August 21, 1930, Mrs. Potter asked Max Lach to enter her employ and "do the things for her that her son previously had done", enumerating them, and that she said to Lach: "I'll remember you in my will." Several witnesses testified that Lach for a period of over 15 years performed the services requested of him up to the time of Mrs. Potter's death. The suit was based upon a quantum meruit. Mrs. Potter died intestate.

The defendant called for proof of the plaintiff's claim and also denied that the services, if rendered, were worth the 75 cents an hour which plaintiff demanded. Defendant also denied that the plaintiff spent the number of hours serving defendant as alleged. The defendant also alleged that "all services performed by the plaintiff for the decedent, Minnie B. Potter, were fully paid for and her liability therefor fully discharged, by a reduction in the rent orally agreed upon between the plaintiff and the said decedent when he became a tenant in her house situated at 316 East Drinker Street, Dunmore, Pa.," which he occupied as a tenant from the year 1939 until decedent's death in February 1945. Defendant also averred "that the usual and customary rent charged for the use and occupancy of the said property" on Dunmore Street "was forty (40) Dollars per month, but the rent agreed upon between the plaintiff and the said decedent, in consideration of such services as he might be called upon to perform as handyman in and around said decedent's premises and person, and for said decedent's convenience and comfort, including any and all such services, if rendered, as plaintiff now alleges and now seeks to collect from said decedent's

estate in this action, and that such reduction in the rent for said property, amounting to twenty (20) dollars per month, should be and was accepted and regarded as full and complete compensation for any and all services he might or should render decedent so long as he should occupy said residence at said reduced rental."

Defendant also pleaded the statute of limitations as to any and all services alleged to have been performed by plaintiff prior to February 22, 1939, or six years prior to said decedent's death. Defendant also pleaded that if these services were rendered as claimed they are presumed to have been paid for at periodic intervals, to wit, each and every month.

After trial a verdict was returned in favor of the plaintiff in the sum of $7,000. A rule granted to show cause why judgment for the defendant n. o. v. should not be entered was later discharged. This appeal followed.

The evidence in this case is as follows. Mrs. Irene Hafner testified that she was once engaged to marry Mrs. Potter's son, Ralph, and that she knew Mrs. Potter since 1925. Mrs. Hafner's mother was married to Max Lach and the latter was, therefore, the witness' stepfather. After the funeral of Ralph Potter, Mrs. Hafner went to Mrs. Potter's home, where she heard Mrs. Potter say to Max Lach: "Max, now that Ralph is gone I have no one to turn to but you. I want you to work for me, doing the repairing here and at my cottage at Lake Ariel, driving the car and keeping it clean, cleaning the sidewalks off, taking the ashes out, cutting the lawn and the hedge; and all work that Ralph had done before I want you to do for me now. You'll never be sorry. I'll remember you in my will." and she testified that Lach replied: "Mrs. Potter, I'll be only too glad to help you out, as I have before." She testified that when Ralph was alive he always "drove the car and kept it clean. He always cut the hedge and the lawn, taking care of the repairs at the house and at the cottage at Lake

Ariel, and take ashes out, do any repairing. He did all those things."

Mrs. Hafner was a frequent visitor at Mrs. Potter's home. She went there often for supper or dinner. She saw the plaintiff cutting grass and performing other services about the house. She testified that she also saw him cleaning and simonizing the car, cutting the grass and the hedge, cleaning sidewalks, painting porches, and taking care of the garden. At Mrs. Potter's cottage at Lake Ariel she saw him cutting the grass and taking care of the fire. She also saw him repairing Mrs. Potter's fences in Dunmore. She testified that Lach had no other employment except at Mrs. Potter's from 1930 to 1935. From 1935 to 1943 he was employed part time as a laborer in the mines, and from 1943 to 1945 he was employed full time at the Pennsylvania Coal Company. When he had this regular employment his services for Mrs. Potter were performed before and after his regular working hours. She also testified that she knew Lach was not paid for his work at Mrs. Potter's.

Mrs. Hafner testified that her mother and the latter's husband, Max Lach, moved into the other part of Mrs. Potter's house in May 1939 and paid a rental of $20 a month. While the previous rent of this house had been $40 a month, Mrs. Hafner testified that there was no agreement that the reduction of the rent by $20 was to be counted as compensation for Lach. She said that when Mrs. Potter rented the house to Mr. and Mrs. Lach that Mrs. Potter said: "The other half of the house is empty, Irene. I would like to have you move. The rent is $20 a month, but, you have to pay your own water rent; you've got to do your own papering and painting, your own plumbing, your own repairing."

Miss Christine Pletcher testified that she lived near Mrs. Potter, whom she had known for fifty years. She said that Mrs. Potter declared: "She didn't know what she would ever do without Max." The witness added:

"I don't know, myself, what she would have done." The witness said she asked Mrs. Potter: "Don't you ever pay Max?" and Mrs. Potter replied, "No, no, I don't, we have an understanding". She testified as to the extensive nature of Lach's work around both the Dunmore property and the cottage at Lake Ariel. She also testified that the rent of the house occupied by Lach was not reduced by $20 in order to compensate him for the work he did for Mrs. Potter.

Anson J. Laurie also testified as to the many times he had seen Lach work around Mrs. Potter's home. He said he saw him taking care of the heating plant, cutting grass, shoveling snow, painting, repairing the house, cleaning the automobile, and driving the car. He also saw him doing work inside and outside the house.

Severin W. Sekol testified that he employed Max Lach from 1935 to 1943 as a laborer in the mines, that Lach received 75 cents an hour, and that from 1941 to 1943 the average wage for unskilled labor was around 80 cents an hour and from 1943 to 1945 around 90 cents an hour.

There were also other witnesses who testified to the performance of services by the plaintiff for Mrs. Potter and the nature of these services.

For the defendant, Howard Walter testified that he brought produce from his farm at Moscow to Mrs. Potter and that he was there "every week of the summer and once in a while in the winter" and that he had seen Max Lach "mowing the lawn" and once he saw him trimming the hedge. He did not know whether or not Lach had been compensated for the work. He had also seen Lach drive Mrs. Potter to Walter's home in Moscow.

Mrs. Dorothea Bingham testified that she heard her husband talking to Max Lach about cleaning out the eaves and her husband said: "Will you take care of it, like you did when Aunt Minnie lived here?" and added, "If there is any bill I'll pay it." Max Lach said, "I'll be glad to do anything. Mrs. Potter doesn't owe me one

penny." It was brought out on cross examination that Mrs. Bingham's husband (with whom she was not living) was entitled to half of the net estate of Minnie B. Potter.

Another witness for the defendant was Miss Margaret I. Bingham, who testified that "all her life" she knew Mrs. Potter, who was the witness' father's cousin. On one occasion when Mrs. Potter was being taken on an automobile trip to Hawley in a car which the witness was driving and in which Max Lach was also a passenger, she saw Mrs. Potter put money in Lach's hand and he said, "No, no, Mrs. Potter, no; I do not want it. You have been too good to me. You owe me nothing." The witness added, "It appeared to be as though she would give a tip to some one she liked real well. He took it." She also testified that Mrs. Potter told her that she, Mrs. Potter, "was letting them [Max Lach and his wife] have the rent for half the amount she always got, to try and pay Max for what he had done for her." Lach was then paying $20 a month rent and prior to that time the same property was rented for $40 a month. The witness stated that she had seen Max Lach taking care of Mrs. Potter's garden, which she described as "about half the size of this court room". She said that food from this garden went to Lach as well as to Mrs. Potter. Miss Bingham testified that "After the Laches moved to my cousin's house [in 1939] I would say that he [Lach] did all of the work around there." She was asked "How much time do you think was consumed?" She answered: "I hardly know how to go about to estimate that. Certainly he worked—the work that I know he did from the time that my cousin was— that he lived there—would consume easily three days; that is what he did over-time, evenings, mornings, and the days that he was off, and on Saturdays." She also testified that Lach drove the car for Mrs. Potter and she added: "He was always willing,

and at her call, unless he was working. . . . He even took care of the furnace."

Bertha Stevens testified that for the 13 years prior to 1939 she and her husband had occupied the half of the Potter house which Max Lach occupied after 1939 and for it they paid $40 a month rental and also paid the water rent. Her husband cut the grass and the hedge in front of the entire property the summer that Mrs. Potter's son died. After Ralph's death in 1930 Max Lach did the work around the property. He cut the grass and the hedges and took care of the flower garden and the furnace. He took care of Mrs. Potter's automobile and worked around the driveway.

Max Lach was called in rebuttal to deny the statement of Mrs. Dorothea Bingham that he, Lach, had said to Mr. Bingham in June 1945 that "Mrs. Potter doesn't owe me one thing." He testified that when Clarence Bingham and his wife moved away preparatory to living in Chicago that Lach told Bingham that he, Lach, had done the best he could in repairing the rain gutter by putting asbestos cement around it and Bingham said, "I pay you for it" and he said, "No. You don't owe me nothing." He said he did not mention Mrs. Potter's name at all. He also denied that on the return trip from Hawley in 1938 that he had said to Mrs. Potter, "You owe me nothing."

There was no contradiction of the claim that plaintiff did considerable work for the decedent in and about her home for a period of over fifteen years. There was no proof whatever that Lach had ever been paid for these services. There was sufficient evidence, when believed by the jury, to establish plaintiff's claim. It was shown that 75 cents an hour was reasonable compensation for the services rendered. The amount of time plaintiff spent in performing these services is not definitely established but the jury awarded him $7,000 for services extending over a period of 15½ years. This

award was a little less than $500 for each year of service. The jury was justified in inferring that the number of hours which Lach put in each year in performing these services were sufficient in number to justify the award made.

Since this suit was based not on an express contract but on a quantum meruit the plaintiff had the burden of proving (1) the performance of the services, (2) the decedent's acceptance of them, and (3) their value. This is not an action for a breach of an express contract. Such an action and an action on a quantum meruit are utterly distinct.[1] Their respective measures of damages are not the same. In one action the measure of damages is fixed by the parties; in the other action it is fixed by law. When one contracts for the services of another and receives and accepts those services, but without specifying what the compensation shall be, a recovery for the value of the services must be by an action on a quantum meruit.

The Trial Judge in his charge made the following statement: "This is a lawsuit based upon an alleged contract or agreement entered into between Mr. Lach and Mrs. Potter." That oral agreement allegedly made on August 21, 1930, is not legally the basis of this action. It is in the record as evidence in support of the following averments: (1) that plaintiff's services were rendered at decedent's request, (2) that they were not made gratuitously but were to be compensated, and (3) that compensation was to be made only after Mrs. Potter died (thereby preventing the running of the statute of limitations). The statement attributed to Mrs. Potter on that date, asking plaintiff to work for her, specifying the nature of the work, and saying: "I will remember you in my will", is fairly open to the interpretation

---

[1] *John Conti Co., Inc.,* v. *Donovan,* 358 Pa. 566, 57 A. 2d 872. *Cramer* v. *McKinney et al., Executors,* 355 Pa. 202, 49 A. 2d 374. 5 Standard Encyclopædia of Procedure, p. 98.

that if he performed the services requested he would be paid for them at Mrs. Potter's death by a legacy in a reasonable amount. She made no will and since Lach received no compensation for his work he sued on a quantum meruit. Even if there had been no such oral promise as alleged, Lach would still be entitled to compensation if he rendered the services he claims he rendered and if Mrs. Potter accepted them. "Thus if a man is found to have done work for another, and there appears no known relation between them that accounts for such service, the law presumes a contract of hiring:" *Hertzog v. Hertzog*, 29 Pa. 465, 468. See Blackstone, 2 Comm. 443, and Williston on Contracts, Revised Edition, Vol. 1, Sec. 3. Comment a, under Sec. 5, of the Restatement of the Law of Contracts, reads as follows: "Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Implied contracts must be distinguished from quasi-contracts, which also have often been called implied contracts or contracts implied in law."

In Appellant's brief there is cited the following from Section 331 of the Restatement of the Law of Contracts: "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." The comment under Section 331 of the Restatement of the Law of Contracts is as follows: "The requirement of reasonable certainty does not mean that the plaintiff can recover nothing unless he establishes the total amount of his harm; nor does it mean that he cannot get damages unless he proves the exact amount of his harm." One of the illustrations under Section 331, supra, is as follows: "A employs B as master of a whaling ship on a five-year voyage, the compensation to be a share of the net proceeds of oil taken on the voy-

age. After two years B is wrongfully discharged and at once brings action. Although the earnings of the ship after B's discharge are contingent and uncertain, B may be able to lay a sufficient basis for their estimation by giving evidence of the conditions and experience in the whaling industry."

We hold that the evidence in this case does afford a sufficient basis for estimating with reasonable certainty what plaintiff is entitled to for the services which he rendered. The jury awarded him a little less than $9 a week. This is not excessive compensation for the services he apparently rendered the decedent.

In *Schoenbachler's Estate*, 310 Pa. 396, 165 A. 505, the facts were that the claimant left a home to act as housekeeper for Arnold Schoenbachler. No wages were to be paid her and the decedent stated that he would provide compensation by leaving her, in his will, the house in which he lived "with all expenses paid as long as she lives". For almost 12 years and until the time of his death she remained with the decedent as housekeeper. She performed all household duties. Decedent died without making a will and claimant having failed to receive any compensation for services as promised the court below awarded compensation based on a weekly wage of $10 from the time claimant entered decedent's service until his death. We held that claimant was entitled to this compensation for the reasonable value of her services, citing *Kauss v. Rohner*, 172 Pa. 481. We also held that the statute of limitations did not apply inasmuch as there was no contract for weekly or other regular payment during decedent's lifetime: *Conkle v. Byers' Exr.*, 282 Pa. 375.

In *Manone v. Culp, Exr.*, 350 Pa. 319, 39 A. 2d 1, which involved a claim against a decedent's estate to recover for board and lodging furnished the decedent during his lifetime we held that where personal services are rendered pursuant to a contract which

provides for payment at a specified time after conclusion of the services, the statute of limitations does not begin to run until the time set for payment.

34 C. J. S., Section 784, makes this statement: "Where one accepts valuable services from another the law implies a promise to pay for them and the contract implied by law may support a claim against his estate. To warrant a finding of an implied contract of decedent to pay for services rendered by claimant, the elements of intention to pay and expectation of payment must be found to exist. [Citing In re Beaver's Estate, 74 Pa. Superior Ct. 354] . . . A presumption of compensation arises and the presumption of gratuity is inapplicable where the parties were in legal contemplation strangers and not members of a family, [citing Szusta v. Krawiec, 144 Pa. Superior Ct. 530, 19 A. 2d 495] or where there was neither legal nor moral obligation to render the services without compensation, . . . if there was an express or implied contract to pay for the services after the death of the recipient no presumption of payment before death can arise. [Citing Conkle v. Byers' Ex'r., 282 Pa. 375, 127 A. 848; In re Leppold's Estate, 145 Pa. Superior Ct. 60, 20 A. 827]."

It is true that plaintiff's claim is not supported by evidence showing the precise days on which he worked for Mrs. Potter and showing exactly how many hours he worked each day for her, but the evidence is uncontradicted that for over fifteen years he acted as "houseman" for Mrs. Potter in and about her two family town house, taking care of her lawn and her automobile and sometimes driving the latter, and also taking care of her summer cottage at Lake Ariel, and that his services were so essential to her that she said "she didn't know what she would do without him". What services in and about a home are customarily performed by "the man of the house" is a matter of general knowledge, and after Mrs. Potter's son, Ralph, died in 1930 there

was apparently no one to do the work which the son had previously done except the plaintiff, Lach, and this work he performed for the period stated. The work of a "houseman" is as well defined as the work of a chauffeur or the work of a secretary to a busy executive or professional man and there is but little difficulty in estimating the value of such services under the conditions presented in this case. The law does not require that proof in support of claims for damages or in support of claims for compensation must conform to the standard of mathematical exactness. In *Western Show Co., Inc., v. Mix*, 308 Pa. 215, 162 A. 667, we held that evidence in support of a claim for damages was sufficient "if it afforded a reasonably fair basis" for calculating the plaintiff's loss. The same rule applies when the claim is for compensation for services rendered and accepted. If the facts afford a reasonably fair basis for calculating how much plaintiff is entitled to such evidence cannot be regarded as legally insufficient to support a claim for compensation. See also *Weinglass v. Gibson*, 304 Pa. 203.

In *Szusta v. Krawiec*, supra, the services performed for the decedent were characterized as "domestic services" for which she was to have been compensated by the decedent in his will. She was not so compensated. In an action on a quantum meruit the Superior Court in an opinion by Judge Baldrige, held that: "The decedent having failed to compensate the plaintiff in accordance with the alleged agreement, she was entitled to the reasonable value of the services performed. . . . the plaintiff was not a relative of the decedent or his wife. There was no legal implication that her services were periodically paid for, as the agreement provided for payment at the death of Robleski, or that they were voluntarily performed, as there was no legal or moral duty upon her, a stranger, to devote her time and efforts in discharging personal and household duties for him."

In *Conkle v. Byers' Exr.*, supra, the facts were that the deceased entered into a contract with the plaintiff in which the latter was to serve her when and as called upon during the life of the former and at her death to receive in payment therefor Miss Byers' home. Several witnesses were called to testify that the claimant called Miss Byers every morning on the telephone, was constantly in attendance upon her, accompanied her to many different public meetings, assisted her in the work at her home, nursed and cared for her in sickness and in all respects acted the part of a faithful servant and attendant. Miss Byers often expressed to others her appreciation of plaintiff's assistance. In 1918 the deceased executed a will and codicil and by the latter gave plaintiff the house, lot and contents; by a later codicil, however, this bequest was changed to a legacy of one thousand dollars. After the decedent's death this legacy was "accepted without prejudice". At the trial on an action based on a quantum meruit the plaintiff received the sum of $6,030 against the estate of the decedent. This Court said: "Plaintiff and Miss Byers were not related, nor did they reside in the same home, except for a few months shortly before the latter's death. Therefore less stringency of proof is required than would be between near relatives or where the family relation existed. Nevertheless, such a claim as here presented must be carefully scanned and allowed only on clear proof: [Citing cases]" This Court held that the proof in that case measured up to the required standard and after finding that the acceptance of the $1,000 legacy did not preclude plaintiff from recovering full value for the services rendered, affirmed the judgment. In this class of cases, as in others, "the laborer is worthy of his hire".

In this case the trial judge affirmed defendant's request for instructions, as follows: "Claims against the estate of a decedent are looked upon with suspicion,

have been called dangerous by our appellate courts, must be closely scrutinized, and can be established only by evidence which is direct, positive, definite and unambiguous." In that and in other instructions the trial judge held the claimant to a high standard of proof. The jury crediting the testimony of plaintiff's witnesses found that the plaintiff had met his burden of proof and rendered a verdict accordingly. It is significant that there was no denial by any witness that Lach had acted as houseman around the premises of Mrs. Potter both in Dunmore and at Lake Ariel for 15½ years. The testimony of defendant's witnesses was almost as favorable to plaintiff's claim as was the testimony of witnesses called in his own behalf. If claimant had not served as "man of all work" in and about Mrs. Potter's homes, since her son's death in August 1930 until February 1945, defendant should have been able to offer some evidence in denial of plaintiff's claim.

The trial judge also correctly held that "there was no competent evidence which would warrant the inference" that the property which Lach occupied from May 1939 until decedent's death on February 22, 1945, was rented to him "at a reduced rental in consideration for services". The court said: "Such legal evidence as there is, is to the contrary." The fact that Lach was allowed this property at a rental of $20 a month, though the property had previously rented for $40 a month, is consistent with the theory that Mrs. Potter desired him to reside in close proximity to her so that his services as houseman would be more easily available and offered him cheap rent so that he would be near by. One of the witnesses called on behalf of the defense, Miss Bingham, testified that "he [Lach] was always willing and at her [Mrs. Potter's] call", except from 1939 to 1943, when he had a part time job as laborer in the mines, and from 1943 to 1945, when he was employed "full time". Even when he was regularly engaged in wage-earning he

worked for Mrs. Potter before and after his regular working hours.

There were issues of fact in this case which when supported by proof required their submission to the jury under proper instructions. The claim of plaintiff for compensation for services was supported by evidence and by reasonable inference from the evidence. There were no substantial errors in the trial.

The judgment is affirmed.

Mr. Justice PATTERSON dissents.