# Estate of Rubenstein

C.P. of Philadelphia County, O.C. No. 337 DE of 2011

*Timothy Holman*, for objectant.
*David Dembe*, for Commonwealth.
*Dirk Simpson* and *Stephen Taylor*, for accountants.

HERRON, *J.*, Nov. 24, 2014—Rose Rubenstein ("Rose") died testate on August 1, 2010. In her March 9, 1987 Will, Rose named her husband Emmanuel Rubenstein as executor. Emmanuel died in 1990, many years before Rose's death on August 1, 2010. Throughout those years after Emmanuel's death, Dorothy Martin provided nursing and other services to Rose, who had no surviving children. Letters of Administration were granted to Dirk Simpson on September 22, 2010. On August 24, 2012, Dorothy

Martin filed a notice of claim against Rose's estate in the amount of $521,600 for services rendered to Mrs. Rubenstein during her lifetime.

On July 3, 2013, Dirk Simpson, as administrator filed an account of his administration of the Rubenstein estate covering the period August 1, 2010 through May 31, 2013. The account showed a balance of principal and income before distribution of $260,990.52. The accountant proposed to distribute the sums remaining to seven charities named in Rose's will after paying all debts and a specific bequest of $5,000 to Joanne Keczely. Dorothy Martin filed objections to the account to reassert her claim for $521,600. The attorney general also filed objections to the account as to claimed counsel fees, but he subsequently withdrew that objection.

A hearing was scheduled for May 5, 2014 to consider Dorothy Martin's quantum meruit claim for payment by the estate for the services she had rendered to Rose Rubenstein from 1990 to the time of her death on August 1, 2010. Both the estate's administrator and the Attorney General oppose this claim.

Dorothy Martin is a licensed nurse practitioner who was originally hired sometime prior to 1990 to provide nursing services to Emmanuel ("Manny") and Rose Rubenstein. After Emmanuel's death in 1990, Dorothy continued to provide nursing services to Rose. Both the accountant and the attorney general concede, however, that during that time Ms. Martin also performed services for decedent that "went beyond those traditionally associated with nursing care."[1] The broad array of skilled services that Ms. Martin performed for Rose was outlined in detail by the four

---

1. 7/16/14 Attorney General Brief at 1. Accord 7/17/14 Accountant Brief at 1.

disinterested witnesses who testified in support of her quantum meruit claim.

The most impressive, authoritative witnesses were Sally Glassman and Rose Zavasky who worked for Merrill Lynch and had served as long-time financial advisers to the Rubensteins. Ms. Glassman, a wealth financial advisor at Merrill Lynch since 1980, was the head of the Glassman Group which was a team of financial advisers. Ms. Zavasky was a member of that team. Ms. Glassman first met Manny and Rose Rubenstein in 1984; she met Dorothy around the time of Manny's terminal illness. Ms Glassman testified that while Emmanuel was alive, he handled the family finances. After his death in 1990, Dorothy Martin took over the day to day business of family finances because Rose was unable to do so due to her lack of experience, depression and multiple ailments.[2]

When Dorothy was first hired to perform nursing services, there had been a concept of a "shift," which Ms. Glassman could vouch for since she was in charge of overseeing the family's financial arrangements.[3] As time progressed, however, Dorothy's hours and the nature of her services expanded and changed. Some weeks Dorothy worked as many as 80 hours.[4] Glassman noted that she had frequent communications with Dorothy, sometimes three times a week, at other times as often as every day. Depending on the issue, they might communicate at 9 in the night.[5] According to Ms. Glassman, Dorothy's hours "were long. They were inconsistent with any kind of time clock. Dorothy was there when she was needed."[6] In Glassman's view, Dorothy's role was critical; she was

---

2. 5/5/14 N.T. at 17-19 (Glassman); 5/5/14 N.T. at 34-35 (Zavasky).
3. 5/5/14 N.T. at 22 (Glassman).
4. 5/5/14 N.T. at 32, 20-21, 25-26 (Glassman).
5. 5/5/14 N.T. at 28 (Glassman).
6. 5/5/14 N.T. at 20 (Glassman).

"the lifeline for Rose."[7]

Glassman observed that Dorothy performed services beyond those of a nurse or care giver. For instance, she arranged for doctor appointments, took Rose to those appointments, discussed Rose's medical treatment with her doctors, managed all aspects of the household, cared for the car and its inspections. In addition, Dorothy was the intermediary with Merrill Lynch for necessary payments and alerted them to when real estate taxes were due. In Glassman's opinion, Dorothy effectively served as a house manager/administrator/healthcare professional.[8] Eventually, Dorothy was named power of attorney, and Glassman had complete confidence in her serving in this highly responsible role. Yet Dorothy was never paid for these additional responsibilities.[9] Ms. Glassman estimated that in the last 4 to 5 years of Rose's life, Dorothy spent one-quarter to one-half of her time doing these more managerial additional tasks.[10]

The reasons why Dorothy's pay was never increased to compensate for the vital tasks she performed were manifold. Ms. Glassman testified that as Rose's financial adviser she of necessity was concerned that Rose might outlive her financial resources, ironically because of the excellent care she received from Dorothy. As a consequence, Ms. Glassman emphasized the need for frugality which Dorothy took to heart, constantly looking for sales or carrying around coupons. There was also an "ethical" dimension to this; in the last 4 or 5 years of her life, Rose suffered increasingly from dementia. Ms. Glassman did not believe that Rose knew what was going on. There were times, for instance, when Rose did not recognize

7. 5/5/14 N.T. at 20 (Glassman).
8. 5/5/14 N.T. at 20-24 (Glassman).
9. 5/5/14 N.T. at 24-26 (Glassman).
10. 5/5/14 N.T. at 30 (Glassman).

Ms. Glassman when she called; Rose would call Dorothy "mom;" she experienced "cognitive dissidence."[11] At some point, Glassman and Dorothy discussed her entitlement to a higher pay but both felt uncomfortable increasing her pay at a time when Rose lacked the capacity to appreciate the necessity for such an increase. The discussion between Ms. Glassman and Dorothy of this salary increase always floundered on the issue of Rose's lack of capacity:

> We agreed, I mean I said, you know, this is a lot of work, what you are doing is beyond the skills of what you were engaged to do. I am very grateful to you for doing it, but we should talk about a compensation arrangement. And the discussion always landed on the same doorstep, which is yes, we probably should have discussed it when Rose's capacity was more complete, but because it wasn't, it would be an unfair judgment to make because Rose wouldn't have the knowledge that we were making it.[12]

Dorothy was paid every week or so, and continued to be paid only for her nursing services. Because she was power of attorney, Dorothy made out the checks herself and kept meticulous records as demonstrated by Exs. 0-1 to 0-3 which list all the payments from the various Wachovia power of attorney accounts and general accounts. In 2008, for instance, Dorothy was paid $38,179.13 for "nursing services;" in 2009 she was paid $36,574.39 for "nursing services;" while in 2010, she was paid $22,893. Ex. O-1. No hint was raised that Dorothy in any way abused the financial trust she exercised over many years.[13] Instead, Ms

---

11. 5/5/14 N.T. at 26-29 (Glassman).

12. 5/5/14 N.T. at 31 (Glassman).

13. 5/5/14 N.T. at 23 (Glassman). Ms. Martin's attorney specifically asked a Merrill Lynch representative, Rose Zavasky, whether she ever had any concern that Dorothy may have been handling Rose's finances inappropriately. She responded: "I did not feel that way, no, sir." 5/5/14

Glassman emphasized the extremely high, thorough and compassionate care Dorothy provided: "I am completely convinced that Rose Rubenstein would have died a long time ago if it weren't for Dorothy."[14]

Rose Zavasky, the second witness in support of Dorothy's quantum meruit claim, was also employed by Merrill Lynch. Ms. Zavasky stated that she had worked with Rose Rubenstein for 23 years. In the last 5 to 7 years, she spoke exclusively with Dorothy about financial matters. Ms. Zavasky also considered Dorothy as the critical link to the Glassman group, noting that Dorothy as power of attorney took care of everything for Rose. During that period, Ms. Zavasky interacted with Dorothy twice a week. She therefore was familiar with the many responsibilities Dorothy assumed. Dorothy paid all the bills; she oversaw all household duties; she alerted Merrill Lynch when money was needed for household expenses. When Rose needed 24 hour care, Dorothy hired and trained the caretakers. As Ms. Zavasky observed: "The care she gave Rose I have never seen before. It was unbelievable. She would — Rose lived as long as she did because of the care that she gave her. In every way."[15] Like Ms. Glassman, Rose Zavasky believed that Dorothy was never paid for these additional tasks: hiring, training and firing caretakers; handling the household finances; or maintaining the house.[16] Ms. Zavasky also agreed that Rose lacked the capacity to appreciate the variety of the matters handled by Dorothy. She merely accepted those services.[17]

The final two witnesses in support of Dorothy's

---

N.T. at 37 (Zavasky).
14. 5/5/14 N.T. at 31 (Glassman).
15. 5/5/14 N.T. at 35-36 (Zavasky).
16. 5/5/14 N.T. at 38 (Zavasky).
17. 5/5/14 N.T. at 39

quantum meruit claim were nursing caretakers with direct knowledge of the nature and extent of Dorothy's services to Rose. Quinette Rodgers worked as a caregiver to Rose from 2008 until Rose's death in August 2010. She was hired by Dorothy, who also trained her. She observed that Dorothy's responsibilities extended beyond nursing: she took care of the roof, arranged for repairs, did the shopping, interacted with doctors, arranged Rose's appointments, oversaw lawn care, paid the taxes. In Quinette's view, there was never a time when Dorothy performed only nursing services. While Quinette worked a 4 to 9 shift, Dorothy was "24/7." If there was a problem at two in the morning, Dorothy was there. Whenever there was a problem, Quinette would call Dorothy and she was there. In Quinette's opinion, Rose would never have fared well in a nursing home. She was a very dignified woman, but when hospitalized Rose would fight with the nurses and ask for "mommy." In Quinette's opinion, Rose suffered from dementia, frequently calling Dorothy "mommy." Unable to handle her finances, Rose left that chore to Dorothy.[18]

Alice Collins, who worked for Rose as a caretaker beginning in 2000, made similar observations of the quality care Dorothy gave to Rose. She noted, as well, the ways in which Dorothy's care extended beyond nursing: Dorothy took Rose to the doctors; she paid the bills; she paid the caregivers; she did "everything." Dorothy's shift was "every shift;" she was always there. Ms. Collins also noted that Rose was very dignified, and Dorothy always made sure Rose was dressed nicely and not just left in pajamas. Ms. Collins did not work for Rose during her final six years of life, but even during her tenure, Ms. Collins concluded that Rose lacked the capacity to understand the

18. 5/5/14 N.T. at 42-46, 50-53 (Rodgers).

significance of all that Dorothy did for her.[19]

Significantly, the opposing parties chose not to cross examine Rose Zavasky, Quinette Rodgers and Alice Collins out of an apparent concern that any cross-examination might be construed as a waiver of the Dead Man's Act. Their testimony is therefore unrebutted. Similarly, Ms. Glassman was asked only to clarify that she and Dorothy dealt with Rose's finances and that in her view Rose was incapacitated though no proceedings were ever initiated. The key aspects of her testimony were likewise unchallenged and compelling.

## Legal Analysis

A claim for quantum meruit is not based on an express contract. It is utterly distinct from a breach of contract claim. *Lach v. Fleth*, 361 Pa. 340, 348, 64 A.2d 821, 825 (Pa 1949). Claims against a decedent's estate years after the services were rendered are subject to close and careful scrutiny to prevent injustice to the estate. *Estate of Dart*, 426 Pa. 296, 298, 232 A.2d 724, 725 (Pa. 1967). On the other hand, "the law is also clear that where one accepts valuable services from another, the law implies a promise to pay for them and the contract implied by law, a quasi contract, may support a claim against his estate." *Fronheiser Estate*, 15 Pa. D & C 3d 176, 177 (Berks Cty. O.C. 1980)(citations omitted).

In the present case, Dorothy Martin's claim for payment for her services to Rose Rubenstein during her lifetime that went beyond nursing or domestic care is in conflict with the claims of the charities who were the beneficiaries of Rose's will. In this tug-of-war, there are undeniable practical and humane obligations that must be met. In a case with similar conflicting interests, the Pennsylvania

---

19. 5/5/14 N.T. at 56-66 (Collins).

Supreme Court observed that a claim for quantum meruit addresses those obligations:

> The obligations which a man incurs during life, no less than his good deeds, live after him and, to the extent that he lives on through his property, he must discharge the obligations he failed to meet while alive. This is not to say that the record shows Mr. Lebo [the decedent] to have been an unjust man. On the contrary, generous legacies to charities enumerated in his will would attest to a benevolent nature, but, being human, he could, and possibly did overlook the most obvious of obligations, namely, that of paying for services rendered to one in connection with the very property which became the vehicle of his posthumous generosity.

*Estate of Lebo*, 403 Pa. 123, 125, 169 A.2d 105, 106 (1961)(Musmanno, J.)

There is no dispute that Dorothy Martin was initially hired by the Rubensteins sometime before 1990 to perform nursing services and that she was paid for those services. There is also no dispute that after Emmanuel Rubenstein's death in 1990, Ms. Martin "performed services for Decedent that went beyond those traditionally associated with nursing care."[20]

In seeking to obtain payment for these services above and beyond nursing care, Ms. Martin must prove her quantum meruit claim. Under Pennsylvania law, a plaintiff seeking to recover payment for services rendered bears the "burden of proving (1) the performance of the

---

20. 7/16/14 Attorney General Brief at 1. See also 7/17/14 Administrator's Brief at 1 ("From some time prior to 1990 until the death of Rose Rubenstein ("decedent") on August 1, 2010, objectant was decedent's nurse and caregiver. During that time, objectant also performed services for decedent that went beyond those services traditionally associated with nursing care")(citations omitted).

services, (2) the decedent's acceptance of them, and (3) their value." *Lach v. Fleth*, 361 Pa. 340, 348, 64 A.2d 821, 825 (1949). Moreover, where a claimant seeks to recover payment for services rendered to a decedent after his death, she has the heavy burden of showing by clear and convincing evidence that payment for those services had not been made during the decedent's lifetime. *Consentino v. Vittoria*, 394 Pa. 538, 541, 147 A.2d 839, 841 (Pa. 1959).

Typically, in a quantum meruit claim, the party seeking such payment from a decedent's estate is barred under the Deadman's Rule, 42 Pa.C.S.A §5930, from testifying about conversations with the decedent or "as to any transaction or event which occurred before the decedent's death." *Hera v. McCormick*, 425 Pa. Super. 432, 444, 625 A.2d 682, 688 (1993). *See generally, Estate of Lebo*, 403 Pa. at 126, 169 A.2d at 107. While this can create an enormous obstacle for a quantum meruit claim, in this case Ms. Martin easily overcame it by presenting the testimony of disinterested, authoritative witnesses as to the nature and extent of her services to Rose. Sally Glassman of Merrill Lynch had known the Rubensteins since 1984. In fact, Rose demonstrated her trust in Ms. Glassman by naming her as an alternative executor in her will. Likewise, Rose Zavasky, as a member of Merrill Lynch's Glassman group, was intimately familiar with the Rubenstein's financial matters since she had worked with Rose Rubenstein for over twenty years. Both witnesses outlined the demanding services Dorothy performed for Rose: paying the household bills including real estate taxes; hiring, training, supervising and firing caretakers; managing household affairs, supervising Rose's medical care, alerting Merrill Lynch when cash infusions were necessary for household management.

The estate's administrator, however, asserts that

Dorothy's claim for compensation for these services should be denied due to the legal presumption of payment. Because Ms. Martin was paid periodically for the nursing services she provided, he asserts, any additional services she may have provided are either gratuitous or not sufficiently distinct from nursing services as to merit additional payment.[21] Numerous Pennsylvania cases, however, conclude that this presumption of periodic payment is limited only to domestic or nursing services. In *Davies' Estate*, 60 Pa. Super. 360, *2, 1915 WL 4422 (Pa. Super 1915), the court acknowledged the "presumption raised by the law to protect the estates of deceased persons from stale claims for the wages of ordinary services." On the facts before it, however, the *Davies* court concluded that the services of a claimant as bookkeeper, clerk and general housekeeper were different from those of a domestic servant and, as a consequence, the presumption of periodic payment does not apply. *Accord Estate of Lebo*, 403 Pa. 123, 128, 169 A.2d 105, 108 (Pa. 1961)(where claimant was not a domestic servant, the presumption that payment was made at regular period does not apply); *Estate of Gibbs*, 266 Pa. 485, 489, 110 A. 236 (Pa. 1920) (the presumption of periodical payments applies to claims for domestic servants). It is clear from the testimony of Ms. Glassman and Ms. Zavasky that Dorothy's services were far more managerial than domestic or nursing services. That testimony was unrebutted and unchallenged by cross-examination. *See generally In re Mack's Estate*, 278 Pa. 426, 430, 123 A. 462, 463 (Pa. 1924)(noting failure to cross examine testimony that payment had not been rendered for services left that testimony unchallenged).

As evidence both of her careful handling of Rose's finances and the limited nature of the payments she had

---

21. 7/17/14 Administrator's Brief at 3-4.

received, Dorothy presented a chart of checks paid to her drawn from various Wachovia accounts from April 2007 to August 4, 2010. These checks bore the memo "nursing" and demonstrated that Dorothy had received $26,762.31 for nursing services in 2007; she had received $38,179.13 for nursing services in 2008; she had received $36,574.39 for nursing services in 2009 and she received $22,893 for nursing services in 2010. *See* Ex. 0-1. No challenge was presented to this evidence of payment for nursing services. In fact, counsel for the administrator and for the attorney general stipulated to their admission.[22] This record thus establishes that Dorothy was paid solely for her nursing services. No evidence to the contrary was presented.

Since claimant established that she had provided financial and administrative services to Rose for which she had not been compensated despite Rose's acceptance of those services, the next challenge is to assess the amount of damages. The assessment of damages for a breach of contract action also differs from assessment of damages in a quantum meruit claim:

> Their respective measure of damages are not the same. In one action the measure of damages is fixed by the parties; in the other action it is fixed by law. When one contracts for the services of another and receives and accepts those services, but without specifying what the compensation shall be, a recovery for the value of services must be by an action on a quantum meruit.

*Lach v. Fleth*, 361 Pa. at 348, 64 A.2d at 825.

To buttress her claim for damages, Dorothy presented the expert report of Ann Myers as to the levels of compensation between 1990 through 2010 for caregivers/home health

---

22. 5/5/14 N.T. at 68-69.

aides and care managers. All counsel stipulated to the admission of these expert reports without the necessity of calling Ms. Meyers to testify as to its content.[23] According to this report, a home health care aide provides routine personal healthcare to an individual in his or her home. In contrast, a care manager "provides planning, advocacy and service coordination for the elderly or disabled."[24] Their pay scales differ to reflect the different levels of services provided. While home health care aides in 2009 and 2010 received an hourly wage of $23, the rate of pay for care managers was considerably higher to reflect their more varied services to provide coordination of in-home care and financial services for an elderly or incapacitated person. In 2008 through 2010, a care manager would typically receive between $85 to $100 per hour.[25]

The statute of limitations must also be factored into these calculations. The claimant contends the relevant statute of limitations is 6 years, citing two old cases: *Koonce's Estate*, 105 Pa. Super. 539, 161 A. 578 (1932) and *In re Porter's Estate*, 110 Pa. Super. 27, 167 A. 490 (1933).[26] *Koonce's Estate*, in turn, relied on 12 PS §31, which is no longer in effect. There is presently a specific statute of limitations in effect for a quantum meruit claim set forth in 42 Pa.C.S.A. §5525[27] as four years. *Ragner*

---

23. 5/5/14 N.T. at 80-81. The expert report is Ex. 0-7.

24. Ex. O-7 at ¶2.

25. Ex. O-7. These are the rates for individuals providing care manager services as an independent contractor. Compensation for services provided through an agency are slightly higher at $120 an hour in 2008 and 2010.

26. 6/20/14 Martin Brief at 28. Since the account was filed on July 3, 2013, she would count back 6 years to July 2007 and calculate the amount of damages due for services between July 3, 2007 through Rose's death on August 1, 2010.

27. 42 Pa.C.S.A. §5525. Four year limitation

(a) General rule. Except as provided for in subsection (b), the following actions and proceedings must be commenced in four years:

(4) An action upon a contract implied in law, except an actions sub-

*Benson Inc. v. Bethel Mart Assocs.*, 308 Pa. Super. 405, 414, 454 A.2d 599, 603 (1982); *Bednar v. Marino*, 435 Pa. Super. 417, 427, 646 A.2d 573 (Pa. Super. 1994)(action for quantum meruit on an implied contract is subject to a four year limitation). This then raises the issue of the application of this 4 year limit. The claimant suggests that the limitation applies back from the time of the filing of the account, relying once again on *In Porter's Estate*, 110 Pa. Super. 27, 167 A.490 (1933) and *In re Koonce's Estate*, 105 Pa. Super. 539, 161 A. 578 (1932).[28] In explaining this calculation back from the filing of the account, the court in *Koonce's Estate* rejected the suggestion that the quantum meruit claim did not begin to run until the termination of employment. The court noted that there had been a long period of employment with an uncertain rate of compensation. The claimant had made several demands for payment but did not bring a claim on them until an account was filed after decedent's death. According to the *Koonce Estate* court, the filing of an account in such a quantum meruit claim based on a long period of service "has the effect of a pending suit" or was tantamount to making a claim.[29] In the present case, in contrast, Dorothy

---

ject to another limitation specified in this subchapter.

*In re Koonce*, is annotated under a different statute of limitations for six years in 42 Pa.C.SA. §5527. This section deals specifically with eminent domain and with "(b) Other civil action or proceeding — Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years." Section 5525(a)(4), however, specifically references quantum meruit. As a general rule of statutory interpretation, the more specific provision of section 5525(4) would control over the general provision of section 5527. *See* 1 Pa.C.S.A. §1933.

28. Both of these cases applied a 6 year statute of limitations based on 12 P.S. §31, which is no longer in effect.

29. *In re Koonce's Estate*, 105 Pa. Super, at 542, 161 A. at 579. In a much earlier case, the Pennsylvania Supreme Court suggested that the statute of limitations for a quantum meruit did not mature until the decedent's death so there would be no bar to recovery of any part of the claim in that case. The court ultimately concluded, however, that the jury

Martin did not wait until the filing of an account to assert her claim against the estate. Instead, she filed a notice of claim on August 24, 2012 so that the statute of limitations should count back 4 years from that formal claim to August 24, 2008. Ms. Martin is therefore entitled to compensation for her service to Rose for the two year period from August 24, 2008 to August 1, 2010, the date of Rose's death.

The testimony as to the amount and dates of Dorothy's longstanding service to Rose admittedly lacks specificity but this is not uncommon in quantum meruit cases. As one court emphasized in recognizing a quantum meruit claim, "[w]hile it is true that the claim is not supported by evidence showing the precise days on which she worked and showing exactly how many hours she worked for decedent each day, the evidence is uncontradicted that for ten months the claimant provided essential services to the decedent." *Fronheiser Estate*, 15 Pa. D. & C. 3d 176, 179 (Berks Cty. O.C. 1980). The same is certainly true for Ms. Martin who was characterized as "the lifeline" for Rose by her Merrill Lynch advisor, Sally Glassman. In cases premised on quantum meruit against a decedent's estate, the amount and nature of services is typically elicited through testimony by disinterested individuals who witnessed those services. *See, e.g. Estate of Lebo*, 403 Pa. 123, 169 A.2d 105 (1961)(one witness testified that claimant made investments and paid bills for decedent while a bank vice president testified that claimant came to the bank on decedent's business 3 or 4 times a week); *Lach v. Fleth*, 361 Pa. 340, 64 A.2d 821 (Pa. 1949)(testimony by neighbor, claimant's step-daughter, observer and mine employer as to services rendered by claimant provided sufficient basis for estimating with reasonable certainty

charge as to the computation of damages had erred. *Kaus v. Rohner*, 172 Pa. 481, 33 A. 1016 (Pa. 1896).

claimant's quantum meruit payment).

In this case, Ms. Glassman testified that Dorothy worked long hours that were inconsistent with a clock. There were weeks when Dorothy worked as much as 80 hours. Ms. Glassman stated that she had frequent contact with Dorothy, usually 3 times a week but sometimes every day when necessary. Based on this contact, she estimated that in the last 5 years of Rose's life, Dorothy spent one-quarter to one-half of her time doing the administrative tasks other than nursing.[30] Ms. Zavasky of Merrill Lynch, likewise, consulted closely with Dorothy on issues involving Rose's care. She noted that Dorothy gave Rose incredible care; in fact, she believed "Rose lived as long as she did because of the care that she [Dorothy] gave her."[31] Dorothy managed the 24 hour care Rose came to need while paying the bills. Quinette Rogers, who worked as a caregiver for Rose from 2008 until Rose's death on August 1, 2010, testified that Dorothy was "24/7." She was available to care for Rose 24 hours a day.[32] Dorothy would come to work at 7 a.m. and then every day stay around after Quinette arrived to take care of lawn care, medications, coordinating the work of 3 caregivers, shopping, paying taxes.[33] Significantly, none of this testimony was subjected to cross-examination or subjected to conflicting evidence.

Although this evidence is unrebutted, it is also necessarily imprecise. Because claims against a decedent's estate are subject to strict scrutiny, the more conservative estimate by Ms. Glassman that Dorothy spent one-quarter of her time on non-nursing or managerial tasks should be applied. If, again conservatively, Dorothy is credited with working a 40 hour week for Rose, then 10 hours a week would have

30. 5/5/14 N.T. at 30, 20, 28, 32 (Glassman)
31. 5/5/14 N.T. at 37 (Zavasky).
32. 5/5/14 N.T. at 47, 52, 53 (Rogers).
33. 5/5/14 N.T. at 47-49 (Rogers).

been devoted to managerial responsibilities. According to the expert report of Ann Meyers, for the period between 2009 through 2010 care managers providing services as an independent contractor would have been paid between $85 to $100 per hour. Applying the lower $85 per hour fee to ten hours per week would result in $850 per week for managerial services. But Dorothy admittedly was paid for her nursing services. It is therefore necessary to integrate the salary differential between the payments she received for nursing services and the payment she was due for care manager services by the following calculations:

(1) Calculate the average hourly rate for nursing services that Dorothy received from August 2008 through August 2010 which is $18 per hour for nursing services;[34]

(2) Subtract that hourly rate for nursing services from the $85 hourly rate for care manager services, which would be $67;

(3) Multiply this $67 differential by 10 to obtain $670 as the weekly added payments due Dorothy for her care manager services over the nursing care payments she received;

(4) Multiply that weekly differential of $670 by 52 to determine the added payments due Dorothy for 1 year of service as care manager, which would be $34,840;

(5) Multiply $34,840 by 2 to obtain the total amount

---

34. 2008: $38,179
2009: $36,574
2010: $39,245 (as average for 2010)*
$113,998 for 3 years divided by 3 = $37,999 as average annual salary
Divide this average annual salary of $37,999 by 52 weeks = $731 per week
Divide this average weekly salary of $731 by 40 to get the hourly rate of $18.26 or $18 an hour for nursing services.

due Dorothy for the period August 2008 through August 1, 2010 which would be $69,680 for her care manager services.

For the slightly less than 2 year period from August 24, 2008 through August 1, 2010 for which Dorothy may recover under the statute of limitations, Dorothy Martin is therefore entitled to $69,680 as quantum meruit compensation for the additional managerial services she performed for Rose for which she was not compensated.

Because the account as filed did not recognize the claim of Dorothy Martin, it shall be returned unaudited. In the interest of providing appellate review of this conclusion, if desired, a final order recognizing the claim of Dorothy Martin shall be contemporaneously issued.